WILLIAM J. BULMAN, PLAINTIFF-RESPONDENT, v. JOSEPH M. McCRANE, JR., TREASURER, STATE OF NEW JERSEY, ET AL., DEFENDANTS-APPELLANTS.

Argued October 24, 1973—Decided December 12, 1973.

*Mr. Stephen Skillman,* First Assistant Attorney General, argued the cause for appellants (*Mr. George F. Kugler, Jr.,* Attorney General; *Mr. Morton I. Greenberg,* Assistant Attorney General, on the brief).

*Mr. Kenneth L. Estabrook* argued the cause for respondent (*Messrs. Lindabury, McCormick & Estabrook,* attorneys; *Messrs. Richard R. Width and Peter A. Somers,* on the brief).

The opinion of the court was delivered by

CONFORD, P. J. A. D., Temporarily Assigned. The Chancery Division struck down as offensive to our constitutional debt limitation provision, *Const. of 1947, Art.* VIII, *Sec.* II, *Par.* 3, a proposed arrangement by the State to take a 25 year lease on a building to be erected by a developer on state-owned land and to be used by the State as a records storage center and printing facility. 123 *N. J. Super.* 213 (1973). We certified the case prior to its consideration by the Appellate Division. 63 *N. J.* 505 (1973).

The State was to have the option to purchase at fixed, progressively declining figures during the 10th, 15th and 20th years of the lease, failing which, title to the building would revert to the State at the end of the term. The terms and conditions of the integrated transaction for construction of the building and lease thereof to the State, to be effected on behalf of the State by the Division of Building and Construction and the Division of Purchase and Property, both in the Department of the Treasury, are accurately summarized in the reported Chancery Division opinion and need not be repeated here.

█ █ At the outset we state our concurrence in the conclusion arrived at by the Chancery Division in response to the contention of respondent that the State officials named above were without statutory power to enter into the transaction. The determination was that there was ample such power "if the transaction now before the court is a bona fide lease not in contravention of the constitutional debt limitation". 123 *N. J. Super.* at 220. We agree with and adopt the reasons advanced by the Chancery Division in that regard. *Id.* at 220–221. And since, for the reasons hereinafter set forth, we find the lease a *bona fide* one free from constitutional defect, we reject the plaintiff's contention of absence of statutory power. We further dismiss the contention of plaintiff that the arrangement for the construction of the building violates the statutes pertaining to ad-

vertising for bidding, *N. J. S. A.* 52:32–2; 34–8. Here, again, the controlling question is whether the basic transaction is a lease. If so, as we are here holding, the bidding statute is irrelevant. See *N. J. S. A.* 52:34–9(c). It is noteworthy, however, that the State did advertise for bids and awarded the contract to a responsible bidder who was the lowest of four bidders on the square foot rental rate.

Before turning our attention to what we regard as the major issue — whether the basic transaction here is a lease — we must consider the Attorney General's alternative argument on behalf of the State, rejected by the Chancery Division, that the transaction did not involve an amount of money large enough to come within the constitutional proscription: "* * * a debt or debts, liability or liabilities of the State, *which together with any previous debts or liabilities* shall exceed at any time one per centum of the total amount appropriated by the general appropriation law for that fiscal year, * * *." (Emphasis added.)

The Attorney General points out that the total potential liability of the State under the lease is $3,644,075, which is less than one percent of the fiscal 1972–1973 legislative appropriation of $2,047,934,209. His legal contention is that the approximate $1,200,000,000 in presently outstanding State bonds is not to be included within the text, "any previous debts or liabilities," in the excerpt *italicized* above, within the true meaning of the Constitution. The implied position is that once the people have voted on specific items of funded debt pursuant to the constitutional mandate the policy underlying the debt limitation provision is met as to such debts and thereafter only new debts aggregating in excess of the one percent limitation are of constitutional concern.[1] In refusing to entertain that position, the trial

---

[1] The Attorney General asserts that aside from the mentioned bonded indebtedness the State has no other debts, claiming that "all other State liabilities are in the ordinary course of business pursuant to appropriation bills and are thus funded." Reliance for this

court described it as "far-fetched" and as creative of a "financial bonanza" of which one would have expected the State to take advantage before if sound. (123 *N. J. Super.* at 239). It seems to us that a more substantial argument against the position is that the constitutional language does appertain to "any" previous debt, etc., and that approval by the people at previous referenda of $X in debts does not necessarily signify satisfaction by them with a total outstanding debt of $X plus $Y. But a rejoinder is suggested by the circumstance that the people in voting on a particular debt are not informed by the ballot what the prior outstanding debts are, nor is the question of their satisfaction with the grand debt total required by the Constitution to be submitted to them.

It is also noteworthy that under plaintiff's position every new State debt, no matter how small, must be submitted to popular referendum once previous debts, although approved, pass the one per centum limitation. In the present state of New Jersey's existing bonded indebtedness, the mentioned situation would continue for the foreseeable future.

We think this issue of constitutional interpretation raised by the Attorney General is a substantial one. Unfortunately, however, it was not adequately researched for us by either side. No case on point is cited. Our own independent search of the 1844 and 1947 constitutional proceedings has revealed no significant light as to the framers' intent in the respect under contention. See Proceedings of the New Jersey State Constitutional Convention of 1844 (1942) at 135, 185, 203, 277, 310–311, 340–343, 519–522, 524–527, 595; V Proceedings, Constitutional Convention of 1947, at 543, 590, 600,

---

assertion is placed upon an affidavit of an official in the Department of the Treasury which purports to explain various apparent liabilities of the State as not being debts. Plaintiff vigorously disputes those factual assertions and the Attorney General's conclusions therefrom. On these technical matters, testimony, probably including that of experts, is essential, and the issues could not properly be resolved on the motions for summary judgment made below.

601, 602, 844. In these circumstances, and in view of the
fact that the instant litigation will be concluded by our de-
termination that the contract for a lease did not create a
debt or liability within the constitutional proscription, we
defer to another day resolution of the issue posed.[2]

We thus turn to the primary subject of the appeal — the
holding of the Chancery Division that the transaction in sub-
stance creates a debt of the State and not a lease, the court
having correctly conceded (123 *N. J. Super.* at 222–223)
that a true lease would not offend the prohibition of "debts"
or "liabilities" not qualifying under the constitutional re-
quirements for the enabling statute and for approval of the
people by referendum (the text of the constitutional section
is found in 123 *N. J. Super.* at 217–218). After an exten-
sive examination of cases in other jurisdictions, some in-
volving leases for public uses by independent public authori-
ties and others by private lessors, as here, the court con-
cluded "that the arrangement in this case is an installment
contract of purchase and not a lease" and therefore violates
the debt clause (*Id.* at 233). Found influential were the cir-
cumstances (a) that the State retained ownership of the
land, with the "incongruous result if, at the expiration or
earlier termination of the lease, the builder-developer should
own a building on land title to which was in the State";
(*Id.* at 234); (b) the fact that the proposed building would
have value at the end of the term, of which the State would
get the benefit without further cost (*Ibid.*); (c) the builder-
developer would be recapturing during the period of the
lease his total cost of construction, profit and financing ex-
pense (*Id.* at 236); and (d) formal opinions by the Attor-

---

2It is to be noted that determination of the issue as to whether
this transaction is a debt within *Art.* VIII, *Sec.* II, *Par.* 3 is useful
even if the Attorney General's alternative position ultimately pre-
vails. In that event the State's fiscal officers would still need to know
whether this transaction is to be charged against the quantum of
"free" debts up to 1 percent of the appropriation law.

ney General in the past that transactions like this constituted a debt subject to the debt limitation clause (*Id.* at 237–239).

A reading of the trial court's opinion in this matter and the cases from other jurisdictions cited therein, as well as of the opinions of this Court in such cases as *McCutcheon v. State Building Authority*, 13 *N. J.* 46 (1953); *Clayton, et al. v. Kervick, et al.*, 52 *N. J.* 138 (1968); *Holster v. Bd. of Trustees of Passaic County College*, 59 *N. J.* 60 (1971); and *N. J. Sports & Exposition Authority v. McCrane*, 61 *N. J.* 1 (1972), reveals that the varying approaches by courts to assertions of violation of debt limitation clauses have been largely dependent upon the differing views of judges as to the scope of the evils sought to be abated by such clauses and as to the degree of flexibility in methods of financing publicly needed facilities which should be accorded modern legislatures and public officials where such methods do not seem to entail the conditions which begot the debt limitation provisions but may yet, on analytical scrutiny, be strongly argued in substance to offend the letter thereof. The *McCutcheon* and *Clayton* cases, both *supra,* although partly distinguishable from the instant situation in that independent authorities were implicated in the financing plans in those cases, are pertinent in respect of the contrasting treatment in the respective prevailing opinions of the question whether leases by such agencies to state operating departments were truly leases, or rather, to the contrary, installment contracts to purchase, creating present debts within the constitutional provisos. The decisions are also demonstrative of the evolution of the current attitude of this court in the general area.

In *McCutcheon* the Legislature had created a State Building Authority and empowered it to issue bonds to acquire, construct and operate building facilities, and to lease them only to the State or any of its agencies and departments. The bonds expressly stated that they were not to "be deemed to constitute a debt or liability of the State or of any political

subdivision thereof or a pledge of the faith and credit of the State or of any such political subdivision." Since the income of the Authority was solely from rentals and the Authority could rent only to a governmental division, payments for the bonds would be indirectly made out of the State Treasury. The majority of the Court felt that the statute impermissibly evaded the debt limitation because upon the payment of the bonds the Authority could be dissolved and the State acquire the building. Justice Jacobs, joined by Justice (now Mr. Justice) Brennan, dissented. 13 *N. J.* at 66 *et seq.* He was of the view that the bonds were not obligations of the State but only of the Authority. The State's only obligation was to pay the annual rental. It was pointed out that the great weight of authority indicated that future rents were not debts in violation of such a constitutional debt limitation. (*Id.* at 68–71).

As significant as the differing conclusions of the majority and the dissenters in *McCutcheon* as to the specific holding involved was the broadly sympathetic approach to flexibility in public financing manifested by the dissenting opinion of Justice Jacobs, which in essence was repeated by him, this time for the court majority, in the later case of *Clayton, et al. v. Kervick, et al., supra.* At the Constitutional Convention of 1844, notwithstanding New Jersey itself had not yet issued State bonds and had therefore not experienced the effects of widespread defaults on public debt issues experienced in other states, see Tilton, "Constitutional Limitations on the Creation of State Debt", II Proceedings of Constitutional Convention of 1947, p. 1708, the delegates thought it wise to profit from those experiences, and they adopted a debt limitation clause (*Art.* IV, *Sec.* VI, *Par.* 4 of the *Constitution of 1844*) essentially like the present one except that the specified debt limitation was $100,000 (revised to one percent of appropriations by the Constitution of 1947), (13 *N. J.* at 67–68). The language of the debt limitation clause itself suggests a particular concern with state funded

indebtedness as such ("to pay the interest of such debt or liability as it falls due, and also to pay and discharge the principal of such debt and liability within thirty-five years from the time of contracting thereof") (*Id.* at 68). To subject future rentals under state leases to the constriction of the debt limitation clause "would seriously impair the State's outstanding leases and would severely restrict its power to avail itself of the acknowledged advantages of negotiating long-term leases where the public interest dictates such action" (*Id.* at 71). The dissent quoted with approval from the Pennsylvania Supreme Court decision in *Kelley v. Earle,* 325 *Pa.* 337, 190 *A.* 140, 147 (Sup. Ct. 1937), to the effect that "It is never an illegal evasion to accomplish a desired result, lawful in itself, by discovering a legal way to do it". (13 *N. J.* at 76). And to the same effect see *Clayton, et al. v. Kervick, et al., supra* (52 *N. J.* at 151–152).

In *Clayton, et al. v. Kervick, et al., supra* (52 *N. J.* 138), the Legislature had enacted a statute creating an Educational Facilities Authority for the purpose of constructing projects and leasing them to participating educational institutions. The financing of the operation was accomplished by a bond issue of the Authority. But unlike *McCutcheon,* where the State would eventually pay for all the rentals, here the rentals would come substantially from sources other than legislative appropriations. While, therefore, in approving the arrangement, *Clayton* did not expressly overrule *McCutcheon,* it was obviously the purpose of the court in *Clayton* radically to revise the *McCutcheon* approach of readiness to find constitutional evasion to one of broad tolerance to permit public financing devices of needed facilities not constituting on their face present, interest-bearing obligations of the State itself or involving the danger of public reproach consequent upon widespread default of formal state-funded indebtedness such as motivated adoption of the original constitutional provision in 1844 (52 *N. J.* at 146 *et seq.*).

That the spirit of *Clayton* remains viable in this state is manifest from the opinions of the court in the *Holster* and *N. J. Sports & Exposition Authority* cases, *supra,* as well as the opinion of Judge (now Justice) Pashman for the Law Division in the latter case, 119 *N. J. Super.* 457, 493–500 (1971), which opinion was approved in substance by this court on the appeal. 61 *N. J.* at 7.

With the foregoing guidelines as to the general approach which should govern us, we proceed to direct examination of the controversy before us and the *ratio decidendi* of the trial judge in invalidating the instant transaction. Concededly, there is no prior New Jersey case directly in point on the facts. We begin with the fact that the agreement here is in form a lease and with the normal assumption that those who challenge the validity of actions of public officials apparently within their statutory powers must carry the burden of demonstrating such invalidity. If the concept of a lease here is defensible theoretically, then, under *Clayton,* there is no present debt, and no constitutional violation. In such event, it should surely make no difference, under the approach of the recent line of decisions of this court cited above, that the parties could have formulated this transaction as an installment purchase had they wished to do so.

Putting to one side, for the moment, the terminal reversion of title to the lessee, the lease terms generally are harmonious with the theory of a lease as opposed to a sale. The lessor pays the taxes (not exceeding those levied in the third lease year). See *West Jersey Grove Camp Assn. v. Vineland,* 80 *N. J. Super.* 361, 365 (App. Div. 1963). As customary, the lessor repairs and maintains the exterior, the lessee the interior. And most significantly, damage to the building impairing useability for the lessee's purposes suspends the rent, and if repairs are not completed within six months the lessee has the option to terminate the lease. *Cf. N. J. S. A.* 46:8–6, 7. While the trial judge adverted to the

fact that there is no reserved right of termination and entry by the lessor in event of a default by lessee, this is at best a neutral factor, since, contemplating the alternative position that the transaction is an installment sale, there would ordinarily be a provision for acceleration and forfeiture for nonpayment of installments — a stipulation absent here. See *Dorman v. Fisher*, 31 *N. J.* 13 (1959). Realism suggests that the lessor's failure to demand a reentry clause is attributable to total confidence that the State will pay the rents as due.

The heart of the Chancery Division decision lies in the circumstances that the developer-builder recaptures his whole investment, costs and profit during the term of the lease, and, inferentially, at any option stage, and that a building inferably still usable at the end of the term goes to the State at that time without additional consideration if a purchase option is not exercised earlier by the State as lessee.

We are of the clear view that the reasoning of this court in the closely analogous case of *405 Monroe Co. v. Asbury Park*, 40 *N. J.* 457 (1960), conduces, in principle, to a rejection of the conclusion of the trial judge. There a property owner in Asbury Park had entered into an agreement with the city to convert an old garage into a special structure for a municipal jail, court and police headquarters and to lease it to the city for a term of 25 years, the city to receive title at the termination of the lease for $1. The reconstruction plans and specifications represented the combined efforts of both parties (roughly true also as to the instant case). After completion and tender of the structure the city attempted to escape from the transaction, and, in the course of the ensuing litigation, set up the defense that the transaction was a purchase, not a lease, and as such violated constitutional and statutory provisions purportedly prohibiting a realty purchase by a municipality in such circumstances. The position thus asserted prevailed in the Chancery Division. 70 *N. J. Super.* 293 (1961). Relying upon substantially the same line

of authority as the trial court in the instant case and the same reasoning, the trial judge held the transaction was a sale and not a lease because "the municipality is bound to accept title and * * * the consideration price for conveyance is the sum total of all the rent payments and no additional purchase price is to be paid". (*Id.* at 303).

While, on appeal, this court expressed disapproval of the municipal tactics and rested its determination partly on grounds of estoppel, Chief Justice Weintraub squarely addressed the lease *vis-a-vis* purchase issue and held the transaction in fact a lease. He said (40 *N. J.* at 465–466):

Since a lessor expects to recover out of rent the depreciation in his investment in addition to a return upon that investment, the amount of rent necessarily depends upon the life expectancy of the structure. If the term of a lease equals the expected life of a building, the lessor will seek to recapture its full value within that period. In such circumstances an option to buy the residual value at the end of the term for a small sum is compatible with the concept of a lease.

Here we have a structure which as a ramp garage was quite single in its purpose and with the alterations we have described became uniquely so, since a jail, a courtroom, police headquarters, and pistol range are of no general utility. Hence the lessor would expect to recoup his investment during the period of the lease. A realtor testified that after 25 years the structure would be of no value to the owner and the cost of demolition would equal the land value. * * *.

In these circumstances the parties could understandably have intended the stipulated periodic payments to constitute rent and nothing else. On the one hand, the lessor, doubtful of any residual value to it of a building altered for those municipal purposes, would insist upon recapturing the investment within the term of the lease, while the lessee, accepting and yielding to the lessor's thesis for fixing rental value, would then expect a terminal option to buy for a nominal sum in the hope that the structure will still be fit to serve the city's special needs. In terms of fiscal integrity, the essence of a lease transaction is that the annual rent shall represent what the parties believe to be the annual value of the use and enjoyment. Two realtors testified the agreed rent represented a fair rent and no expert testified to the contrary. The parties could believe their arrangement was one of lease.

The circumstance in the present case which renders the reasoning in *Monroe Co.* precisely apposite here is the fact

that the State owns the land. At the end of the 25 year term, absent a clause for reversion of the structure to the lessee, the lessor would own a building of no value to him without title to the land. He would be economically compelled to leave the building on site since the cost of removal and relocation would be prohibitive even if otherwise economically practicable. His situation in that regard is comparable to that of the lessor in *Monroe Co.* who would have been left with a special purpose building at the end of the term with no value to anyone but the city. Indeed, the present case is stronger for the hypothesis of no-value to the lessor at the end of the term, since in *Monroe Co.* the lessor owned the land. Yet under the ruling of this Court he was permitted to agree to part with it in favor of the lessee without impugnment of the transaction as a lease.

Thus, entirely consistently with the lease theory recognized and applied in *Monroe Co.,* there is nothing anomalous in the present builder-developer being permitted to collect as rental sufficient to recover his total investment including the depreciation inherent in his reversion as a wasting asset destined to become devoid of economic value at the end of the term. The fact that the State may be advantaged by ultimately acquiring title to a potentially useful building as the residue of a transaction otherwise faithful to the theory of a lease (certainly so from the viewpoint of the lessor) represents no good reason for judicial assiduity in laying hold of that circumstance to destroy the transaction as an unconstitutional debt.[3] The sole obligation of the

---

[3]Note the reasoning parallel with that of *Monroe Co. in Jefferson School Tp. v. Jefferson Tp. School Bldg. Co.*, 212 *Ind.* 542, 10 *N. E.* 2d 608, 611 (Sup. Ct. 1937) where the court met a similar attack as follows:

" * * * The Jefferson Township School Building Company undertook to construct a building which was peculiarly adapted to the needs of the School Corporation and which would be of very doubtful market value at the time of its construction and of little or no market value if the school corporation should discontinue its use

State here is for future installments of rent. They will presumably be paid out of current revenues as annually appropriated for the purpose. Under settled principles, there is no present debt in the constitutional sense. *Clayton, et al. v. Kervick, et al., supra;* and see *Dean v. Kuchel,* 35 *Cal.* 2d 444, 218 *P.* 2d 521 (Sup. Ct. 1950); *Giles v. Dennison,* 15 *Okl.* 55, 78 *P.* 174 (Sup. Ct. 1904); *cf. Hall v. City of Baltimore,* 252 *Md.* 416, 250 *A.* 2d 233 (Ct. App. 1969); *Book v. State Office Building Commission,* 238 *Ind.* 120, 149 *N. E.* 2d 273 (Sup. Ct. 1958).

██ Finally, the plaintiff contends that the arrangement violates constitutional provisions prohibiting the loaning of the State's credit, *Const.* 1947, *Art.* VIII, *Sec.* II, *Par.* 1, and the donation of land or money to private associations or corporations. *Id.; Art.* VIII, *Sec.* III, *Par.* 3. Both of these contentions are specious. The fact that a lessor to the State is able to borrow money on the strength of the expectancy of the rentals to be received is obviously not, as argued, a loan

---

after a few years occupancy. Obviously a fair rental value from the standpoint of the building company would be much higher than the fair rental value of a building easily adapted to various business uses and requiring the same amount of investment as the school building. Since at the end of the 25 years' term the school building would be worth practically nothing to the building company, and unless removed would become the property of the Jefferson School Township, it is clear that a fair rental value during the 25 years' term should produce an amount sufficient to return the sum actually invested, with a reasonable rate of interest thereon. The fact that the building company was willing to give the school building to the Jefferson School Township when the building company had been paid an amount equal to its investment and a reasonable return thereon does not change the lease contract into a contract to purchase. It is true that the Jefferson School Township through the device of a long-term lease providing for annual rental payments may become the owner of a school building which, in view of article 13 of the State Constitution, it could not have acquired in 1928 by issuing bonds. But it does not follow that either the arrangement or the result constitute an evasion of the limitations of article 13 of the State Constitution. The lease contract is not in contravention of article 13 unless if necessarily created a legally enforceable debt obligation for an amount in excess of the amount permitted by article 13.

of the State's credit. Moreover, the public nature of the enterprise insulates it against attack through the loan-of-credit clause even when there is incidental benefit to a private entity. See *Roe v. Kervick,* 42 *N. J.* 191, 218 (1964). Nor is any unconstitutional donation involved here. The State receives substantial consideration for its implied free letting to the developer of the land on which the building is to be erected in that such circumstance necessarily operates to reduce *pro tanto* the lease rental because the lessor need not recapture therein the capital value of the land and a fair return thereon. See *Bayonne v. Palmer,* 47 *N. J.* 520, 524 (1966).

Reversed; no costs.

*For reversal*—Justices JACOBS, HALL, SULLIVAN, PASHMAN and CLIFFORD and Judges CONFORD and COLLESTER—7.

*For affirmance*—None.