150 N.J. Super. 123 (1977)
374 A.2d 1259
CLARENCE S. FRAZIER, PLAINTIFF,
v.
LIBERTY MUTUAL INSURANCE COMPANY, DEFENDANT.
Superior Court of New Jersey, Law Division.
Decided April 7, 1977.
*128 Mr. Joseph Asbell for plaintiff (Messrs. Joseph Asbell & Associates, P.A., attorneys).
Mr. Bruce M. Gunn for defendant (Messrs. Martin, Crawshaw & Mayfield, attorneys).
TALBOTT, J.C.C., Temporarily Assigned.
Defendant Liberty Mutual Insurance Co. (Liberty) moves for summary judgment against plaintiff, plaintiff Clarence S. Frazier to *129 compel him to accept $15 a week on an income continuation claim made under his automobile insurance policy.
The underlying suit is based upon an accident which occurred on August 23, 1974. Plaintiff's vehicle was hit in the rear by another vehicle which was being pursued by the police. This accident disabled Frazier. He could not work at his usual occupation as a packager for CGS Fiberglass of Williamstown, New Jersey, where he earned about $187 a week. Pursuant to N.J.S.A. 39:6A-4(b), a section of the New Jersey Automobile Reparations Reform Act, he made application for reimbursement for medical expenses and income continuation benefits in the amount of $100 a week. The medical expenses have been paid and are not in issue.
Liberty tendered plaintiff $15 a week for his wage losses, claiming he was eligible to receive $85 a week in the form of temporary disability benefits, N.J.S.A. 43:21-25 et seq., and as required by N.J.S.A. 39:6A-6. It is uncontroverted that plaintiff could have applied for and collected the $85 a week in disability benefits. Plaintiff refuses the tender, claiming that N.J.S.A. 39:6A-6 is unconstitutional.
The recent case of Rybeck v. Rybeck, 141 N.J. Super. 481 (Law Div. 1976), upheld the constitutionality of the Automobile Reparations Reform Act N.J.S.A. 39:6A-1 et seq. under a broad-sweep due process and equal protection attack, but that court concluded that some provisions of the act may create constitutional issues. Plaintiff contends that N.J.S.A. 39:6A-6, which reads as follows, is such a provision:
The benefits provided in section 4a., b., c., d., and e. and section 10, shall be payable as loss accrues, upon written notice of such loss and without regard to collateral sources, except that benefits collectible under workmen's compensation insurance, employees temporary disability benefit statutes and medicare provided under Federal law, shall be deducted from the benefits collectible under section 4a., b., c., d., and e. and section 10.
*130 Plaintiff first challenges the constitutional validity of this section on the ground that the statute constitutes a taking of property without just compensation, in violation of the Fifth and Fourteenth Amendments to the United States Constitution. He contends that statute compels an insured to accept less from his insurance company than it contracted to pay. However, Liberty asserts that when the policy is read in conjunction with the above-quoted section of the act it is entitled to deduct the money collectible under temporary disability benefits which is concededly $85 a week.
The Legislature may not deprive a person of life, liberty or property without due process of law. N.J. Const. (1947), Art. I, par. 20, prevents a deprivation of property without just compensation. However, the court is mindful that there is a strong presumption that a statute is constitutional. A legislative act will not be declared void unless its repugnancy to the Constitution is clear beyond a reasonable doubt. David v. Vesta Co., 45 N.J. 301 (1965); Harvey v. Essex Cty. Freeholders Bd., 30 N.J. 381 (1959); In re Loch Arbour, 25 N.J. 258 (1957); Gangemi v. Berry, 25 N.J. 1 (1957); Yellow Cab Co. v. State, 126 N.J. Super. 81 (App. Div. 1973). Judicial enforcement does not permit a court to substitute its own policy judgment for that of the Legislature. Ferguson v. Skrupa, 372 U.S. 726, 83 S.Ct. 1028, 10 L.Ed.2d 93 (1963). If any state of facts may reasonably be conceived to justify the legislation, a court's duty is to sustain it. Rybeck, supra, 141 N.J. Super. at 492; McGowan v. Maryland, 366 U.S. 420, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961); Robinson v. Cahill, 69 N.J. 449 (1976).
The issue here is whether the legislative requirement that deduction of temporary disability benefits be made from the $100 a week income continuation benefits payable under the contract of insurance is a taking of plaintiff's property. Before reaching the question of taking of property it must be *131 shown that N.J.S.A. 39:6A-6 is a proper exercise of the State's police power.
The "police power" of the State is the public right to reasonable legislation for the common good and welfare. Katobimar Realty Co. v. Webster, 20 N.J. 114 (1955); Schmidt v. Newark Bd. of Adj., 9 N.J. 405 (1952). The public interest must require the legislation. Katobimar, supra. The law must not be unreasonable, arbitrary or capricious. The means selected should have a real and substantial relation to the object sought to be obtained. Sabato v. Sabato, 135 N.J. Super. 158 (Law Div. 1975).
A state's inherent power to protect the public welfare may be validly exercised under the Contract Clause even if it impairs a contractual obligation, so long as it does not destroy it. P.T. & L. Constr. Co. v. Comm'r., Dept. of Transp., 60 N.J. 308 (1972); Stamboulos v. McKee, 134 N.J. Super. 567 (App. Div. 1975); and U.S. Trust Co. of New York v. State, 134 N.J. Super. 124, (Law Div. 1975), aff'd, 69 N.J. 253 (1976), app. dism. Gaby v. Port Authority of New York and New Jersey, 427 U.S. 901, 96 S.Ct. 3185, 49 L.Ed.2d 1195 prob. juris. 427 U.S. 903, 96 S.Ct. 3188 (1976), 49 L.Ed.2d 1197. Plaintiff's recovery has been mandated recoverable from particular sources. There is a taking only if that legislative mandate destroys the insurance contract between plaintiff and defendant.
As early as 1911 the New Jersey courts recognized that certain deductions from earned benefits may be required without offending constitutional mandates. Allen v. Passaic Bd. of Ed., 81 N.J.L. 135 (Sup. Ct. 1911). That case holds that deductions from teachers' pay for the teachers' retirement fund was not a taking of property without due process of law or the taking of private property for public use without just compensation. By statutes in 1907 the Legislature decreed as to the employment of teachers that "every person who shall be appointed to any position * * * *132 after the first day of January 1, 1908, shall be a member of the fund by virtue of such appointment." Since the statute was in effect when plaintiff and defendant entered into a contract of employment, the court held it formed a part of such contract and was one of the terms of plaintiff's employment. The court held that the creation of the fund was an important public measure and tended to make the position of teacher a more desirable one, thereby contributing to a more effective educational system. There was, therefore, a strong public and social purpose for the legislation. Persons desiring to become teachers were free to accept or refuse such positions. If they accepted a teaching position, the act was binding upon them. Since the statute formed a part of the contract, the net amount was known, and there was no taking of property in the constitutional sense.
Similarly, the collateral source provision of N.J.S.A. 39:6A-6 is, by the terms of the legislation, incorporated into every contract of automobile liability insurance in the State of New Jersey after January 1, 1973. The need for such reform was clear.
Great injustices existed under the prior system of tort recovery. Under that negligence system a driver had to be entirely blameless in order to recover. Automobile accident victims often waited many years while their claims were processed through the courts. Meanwhile, these victims spent huge sums for medical expenses and lost wages. The most severely injured, who needed the money the most, were often forced to compromise their legitimate claims. Some less severely injured victims were paid quickly and over-generously. To correct these inequities the Legislature passed the first party No-Fault Act, where each person involved in an automobile accident could recover within 30 days of the accident. Recovery from the insurance company for out-of-pocket medical expenses, income continuation benefits up to $100 a week for 52 weeks, essential service benefits, survivor benefits and funeral expense benefits *133 is permitted. N.J.S.A. 39:6A-4. The Legislature had four purposes in mind in enacting the no-fault legislation: (1) to increase the number of persons covered; (2) to reduce the costs of auto insurance; (3) to increase the availability of coverage, and (4) to reduce litigation and court time. Automobile Insurance Study Commission Report to the Governor and the Legislature, Reparation Reform for New Jersey Motorists, at 7 (Dec. 1971).
The most difficult objective was reducing the costs of insurance. The original concept behind no-fault was that the number of law suits would decrease while the number of claims filed against insurers would increase. The debate on the success of the system is now widespread. New Jersey Magazine, Sept. 1976 and May 1976. Sheeran Editorial, The Philadelphia Bulletin (South Jersey ed.), April 4, 1977. Zanate, "Sheeran Denies Rate Rise for 9 Auto Insurers," The Philadelphia Bulletin (South Jersey ed.), Dec. 7, 1976, at 7; Crystal, "No-Fault One Year Later," 97 N.J.L.J. 14 (Apr. 4, 1974).
First, the number of larger lawsuits have not declined. Under no-fault, injured drivers may sue only when the cost of medical treatment for soft tissue injuries (sprains, bruises, abrasions, etc.) exceeds $200. A driver sustaining any fractures, disfigurement or permanent injuries can sue regardless of medical costs. Second, the amount of the average claim has not decreased to offset the increase in claims frequency. The insurance companies have not been able to make up their increased medical payments by saving on legal costs, as anticipated from the desired decrease in suits.
The important device designed to reduce the insurer's burden in its role as the primary source of recovery and thereby reduce costs to consumer-insureds is established in N.J.S.A. 39:6A-6. It provides statutory right to deductions for collateral sources that belong to insurers. Solimano v. Consolidated Mut. Ins. Co., 146 N.J. Super. 393, 397-398 (Law Div. 1977). By handling work-related damages and nonwork-related damages through the no-fault systems of *134 temporary disability benefits, workmen's compensation and Medicare, the Legislature maintained in the collateral sources exception in N.J.S.A. 39:6A-6 the comprehensive design intended to protect working people and the aged for different risks of loss. Fulda, "insurance," Rut. L. Rev. 257 (Winter 1953). The three collateral sources are all forms of social insurance characterized by compulsory participation, prescribed benefits, governmental supervision and equalized costs for participants. Turnbull, Williams and Cheit, Economic and Social Security (3 ed. 1967). Further, the collateral sources, while thought to help absorb the overall costs of liberalization of coverage, also complement public policy to prevent double recovery while ensuring maximum access to sources of indemnification. Silas v. Allstate Ins. Co., 129 N.J. Super. 99 (App. Div. 1974); Selected Risks Ins. Co. v. Schulz, 140 N.J. Super. 555 (Ch. Div. 1976).
For the aforesaid reasons, this court concludes that N.J.S.A. 39:6A-6 constitutes a legitimate exercise of the police powers even though it acknowledges the failure to achieve the cost objectives behind the No-Fault Act. Goldblatt v. Hempstead, 369 U.S. 590, 82 S.Ct. 987, 8 L.Ed.2d 130 (1962), upon which plaintiff relies, supports this conclusion and the Allen rationale, supra. Therein claimants failed to prove that the statutory means were not reasonably necessary in order to accomplish the goals of the ordinance. Debatable questions as to the reasonableness of means are for the Legislature, not the courts. See also, Metropolis Theatre Co. v. Chicago, 228 U.S. 61, 33 S.Ct. 441, 57 L.Ed. 730 (1912) and Ferguson v. Skrupa, supra, 372 U.S. 726, 83 S.Ct. 1028, 10 L.Ed.2d 93.
Under the Allen v. Passaic Bd. of Ed. rationale, supra, N.J.S.A. 39:6A-6 became a part of every contract of automobile insurance after January 1, 1973. This was known, or should have been known, to plaintiff. He could choose to drive or not drive an automobile in the State of New Jersey. Once he made a decision to drive he subjected himself to the State's mandatory insurance laws and to the terms of *135 his insurance, which included the mandatory collectible exclusions provided by the Legislature. This court cannot find any unconstitutional interference with plaintiff's contract of insurance with defendant. Therefore, this court concludes there is no taking of property rights of plaintiff without due process of law under this contract of insurance.
Plaintiff's other due process claim is that N.J.S.A. 39:6A-6 violates N.J. Const. (1947), Art. I, par. 1, and the Fifth and Fourteenth Amendments to the United States Constitution by infringing his alleged fundamental right to make a living. He contends that N.J.S.A. 39:6A-6 forces him to become a public charge against his will.
"Fundamental rights" are those expressly guaranteed or clearly implied by the Federal Constitution. San Antonio Independent School Dist. v. Rodriguez, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973), reh. den., 411 U.S. 959, 93 S.Ct. 1919, 36 L.Ed.2d 418 (1973). The Supreme Court of the United States has not recognized the right to make a living as a fundamental right whose abridgement requires justification by a "compelling state interest" shown by the state. This court finds no effect by N.J.S.A. 39:6A-6 on plaintiff's ability to seek gainful employment or effect on his associational rights. In view of the lack of authority for plaintiff's contention, this court is unwilling to view the "right to make a living" as a fundamental right. It is not proper for courts to pick out certain rights and characterize them as fundamental to give them added protection. Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969) (Stewart, J., concurring). Cf. Robinson v. Cahill, 62 N.J. 473, 491-2 (1973).
Plaintiff's reliance upon Carroll v. Local No. 269, Internat'l Brotherhood, etc., 133 N.J. Eq. 144 (Ch. 1943), is misplaced. There the constitutional issue, in modern terms, was one of the right to association under the First Amendment where membership is an economic necessity. Trautwein v. Harbourt, 40 N.J. Super. 247, 264 (App. Div. 1956). The question of union closed shops is inapplicable here since associational *136 rights are not involved. Cf. Healy v. James, 408 U.S. 169, 92 S.Ct. 2338, 33 L.Ed.2d 266 (1972); Annotation, "The Supreme Court and the First Amendment Right of Association," 33 L.Ed. 2d 865. "Persons with collectible temporary disability payments" are not a cognizable group with membership even if this court were to reframe plaintiff's argument in First Amendment terms. Annotation at 912-926. Compelling collection of temporary disability payments does not make plaintiff a "public charge." Plaintiff could have recovered his full loss of wages if he had followed the mandate prescribed by our Legislature. He chose not to do so. This court will not aid his evasion since the legislation is reasonable. McGowan v. Maryland, 366 U.S. 420, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961).
Plaintiff next challenges N.J.S.A. 39:6A-6 as violative of the equal protection of the laws guaranteed by the Fifth and Fourteenth Amendments of the United States Constitution. He alleges that the statute discriminates arbitrarily against policy holders without collateral sources (those mentioned in N.J.S.A. 39:6A-6) and against the poor. Plaintiff cites no authority on point for either proposition. His equal protection challenge requires discussion of state action, standing and, finally, the tests for equal protection.
There is little question that the instant case involves "state action." The approval by the Department of Labor and Industry of private plans of compensation for temporary disability (N.J., Admin. Code 12:18-2.5) is the kind of state administrative action which constitutes "state action." State action, for purposes of the Equal Protection Clause may emanate from rulings of administrative and regulatory agencies as well as from legislative or judicial action. Moose Lodge No. 107 v. Irvis, 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972). See also, Doe v. Bridgeton Hospital Ass'n, 130 N.J. Super. 416, 427-428 (Law Div. 1974), rev'd on other grounds, 71 N.J. 478 (1976). The administration of the State Plan for compensation *137 of temporary disabilities by the State Treasurer (N.J.S.A. 43:21-46) also constitutes "state action." However, plaintiff argues for the putative rights of third parties  those without collateral sources and the poor. Plaintiff nowhere on the record claims indigency, nor is he without collateral sources.
Plaintiff relies on the United States Supreme Court decision in Nebbia v. New York, 291 U.S. 502, 54 S.Ct. 505, 78 L.Ed. 940 (1934), to sustain his equal protection challenge. In that case the court held that the use of private property and the making of private contracts may be subject to public regulation when the public need requires. The New York statute which sought to prevent destructive price cutting could validly fix different minimum prices for consumer sales by distributors and retailers. The court recognized the rule of standing  that as a basis for attack under the Equal Protection Clause the party complaining must show that he himself is adversely affected by the discriminatory regulation.
Standing to represent putative third-party rights is thoroughly discussed in Sierra Club v. Morton, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972); accord, Warth v. Seldin, 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). Plaintiff does not pass the test. Plaintiff must show a personal stake in the outcome of the litigation or controversy in an adversarial context and in a form historically viewed as capable of judicial resolution. He lacks any personal stake in the question of the rights of those without collateral rights or who are poor. Unlike the situation in Terwilliger v. Graceland Memorial Park Ass'n, 35 N.J. 259 (1961), here the Attorney General was dismissed as a party by consent. There is only public interest to underpin plaintiff's claim to standing. In view of the general public interest in the operation of the No-Fault Act, it might appear that principles of standing should require only a slight additional private interest as justification for a state taxpayer to seek remedy in this *138 court even though plaintiff is a member of a privileged, not a burdened, group. However, even if this court were to conclude that plaintiff has standing his equal protection challenge is without merit.
Under the United States Constitution, "equal protection of the laws" guarantees that persons may not be privileged or burdened by legislation which treats persons similarly situated differently. Washington Nat'l. Ins. Co. v. Board of Review, 1 N.J. 545, 553-554 (1949). Federal equal protection does not require that all persons be treated identically. It requires only that differences in treatment of persons similarly situated be justified by an appropriate state interest; such distinctions may not be irrational or discriminate invidiously. Taxpayers Ass'n of Weymouth Tp. v. Weymouth Tp., 71 N.J. 249, 280-281 (1976). Treatment of nonmotorists is not unreasonable, given the legislative objective to make first party no-fault insurance state-wide and given the fact that household ownership of an automobile is nearly universal in this State. Public Hearing of April 21, 1971 (at 3) and Public Hearing of April 30, 1971 (at 69-70), both before the Commission to Study Certain Automobile Insurance Matters, Including a `No-Fault' Auto Accident Insurance Plan. Therefore, this court concludes there is some reasonable basis for the similarity of treatment of motorists and nonmotorists. This court fails to find a distinction here constituting similar persons in similar circumstances dissimilarly treated, which is required for further equal protection scrutiny. Only when there is a classification irrelevant to the State's objectives is there a constitutional violation. N.J. Chapter, Am. I.P. v. N.J. State Bd. of Prof. Planners, 48 N.J. 581, 601 (1967); Humane Soc. of U.S. v. N.J. State Fish and Game Council, 70 N.J. 565 (1976) (U.S. app. pndg.). Like treatment for motorists and non-motorists may result in some inequities but the overriding reasonableness of the provision obtains. Dandridge v. Williams, 397 U.S. 471, 90 S.Ct. *139 1153, 25 L.Ed.2d 491 (1970), reh. den., 398 U.S. 914, 90 S.Ct. 1684, 26 L.Ed.2d 80 (1970).
In the usual equal protection analysis applied by the Supreme Court a "two-tiered" approach is followed. "Developments in the Law-Equal Protection," 82 Harv. L. Rev. 1065 (1969). First, the burden is on the party attacking the classification to show that it lacks a rational relationship to a legitimate state objective. Secondly, the classification may be upset where it involves suspect criteria or impinges upon "fundamental rights." "Suspect criteria" applies in the case of persons who share immutable characteristics (e.g., skin color and physical features), have a history of unequal treatment and a history of lack of political representation or powerlessness. Frontiero v. Richardson, 411 U.S. 677, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973), and San Antonio Indep. School Dist. v. Rodriguez, 411 U.S. 1, 28, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973), reh. den., 411 U.S. 959, 93 S.Ct. 1919, 36 L.Ed.2d 418 (1973). Then the burden is on the State to show that the classification serves "a compelling state interest." Such a showing is determined by a balancing of the legitimate competing interests of the State against those of the party attacking. Frontiero, supra, 411 U.S. at 677, 93 S.Ct. 1764. The Supreme Court has specifically excluded wealth (or indigency) from the suspect categories. San Antonio Indep. School Dist., supra.
Plaintiff argues that the poor are less likely to have collateral sources of indemnification and therefore the mandatory exclusions in N.J.S.A. 39:6A-6 unfairly discriminate against them. Since neither "fundamental rights" nor "suspect criteria" is attacked by plaintiff, he has the burden of demonstrating that the classification lacks a rational basis. He cites no authority to overcome the legislative presumption of validity. He contends simply that the poor are less likely to be able to obtain indemnification like temporary disability benefits in the first place and will have *140 to pay higher premiums therefore over the long run. This court rejects this bald argument.
Temporary disability benefits are derived from mandatory insurance for all working people regardless of income. No doubt more poor persons are unemployed and thus are without temporary disability benefits. However, if an insured is without these sources, then his automobile insurer would simply not be entitled to any deductions and would have to give full payments. If an individual lacks a car and is involved in an accident, he recovers from the policy of the driver who injures him, less his collateral sources. Moreover, no authority is cited for the proposition that relates the difficulty of obtaining automobile insurance coverage to the lack of having collateral sources. This court refuses to engage in the speculation required by plaintiff's challenge.
N.J.S.A. 39:6A-6 passes muster even were this court to travel beyond the traditional "two-tiered" analysis and apply the "means focused" test. Such test requires a very clear and substantial rational relationship to a legitimate state objective to be proven by the State. Our Supreme Court has applied that test to determine constitutional challenges to nonsuspect criteria which involve very important but nonfundamental rights. Collingswood v. Ringgold, 66 N.J. 350 (1975), app. dism., 426 U.S. 901, 96 S.Ct. 2220, 48 L.Ed.2d 826 (1976); Gunther, "The Supreme Court, 1971 Term  Forward: In Search of Evolving Doctrine of a Changing Court: A Model for a Newer Equal Protection," 86 Harv. L. Rev. 1, 22-24 (1972). The governmental interest in establishing collateral sources to be deducted from recovery obtainable from the insurer effectuates an efficient and more easily accessible recovery procedure under the no-fault system. This court reiterates that elimination of any deductions from the insurer's coverage may reflect wiser policy-making but does not rise to constitutional levels.
Plaintiff also contends he is denied access to the courts for his contract claim. One has a right to access to the courts only *141 to prosecute claims recognizable there. Boddie v. Connecticut, 401 U.S. 371, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971). Plaintiff's claim here is limited by his failure to follow mandated avenues of recovery incorporated into his insurance contract. He is not deprived of access to the courts or a comparable process, any more than if his claim had been cut off by a statute of limitations. Rybeck, supra, 141 N.J. Super. at 507.
Plaintiff's third challenge to N.J.S.A. 39:6A-6, while most provocative, must also fall. Plaintiff contends that the statute violates N.J. Const. (1947) Art. VIII, § III, par. 3, by appropriating public funds for the benefit of insurance companies. Art. VIII, § III, par. 3, provides:
No donation of land or appropriation of money shall be made by the State or any county or municipal corporation to or for the use of any society, association or corporation whatever.
Plaintiff does not refer to Art. VIII, § II, par. 1. That paragraph, however, is by relevant case law read in conjunction with § III to obtain focus on what constitutes "appropriation of money." Sec. II, par. 1 provides:
The credit of the State shall not be directly or indirectly loaned in any case.
The prohibitions embodied in both paragraphs are aimed at assuring that public money be raised and used only for public purposes. Roe v. Kervick, 42 N.J. 191, 207 (1964); accord, N.J. Sports & Exposition Auth. v. McCrane, 119 N.J. Super. 457 (Law Div. 1971), aff'd and mod. on other grounds 61 N.J. 1 (1972). The question, therefore, is whether N.J.S.A. 39:6A-6 constitutes an appropriation of state money or a loan of its credit  and, if it does, whether it satisfies the constitutional requirement of fostering a valid public purpose.
Temporary disability benefits are intended to be reasonable payments to replace wage loss. N.J.S.A. 43:21-29 states that

*142 Disability shall be compensable subject to the limitations of this act (Sections 43:21-25 to 43-21-56) where a covered individual suffers any accident or sickness not arising out of and in the course of his employment or if so arising not compensable under the workmen's compensation law (Title 34 of the Revised Statutes), and resulting in his total inability to perform the duties of his employment. For the purposes of this act, pregnancy may be deemed to be a sickness during the 4 weeks immediately preceding the expected birth of child and the 4 weeks immediately following the termination of the pregnancy.
The source for temporary disability benefits is an approved private plan or the State Plan for which the State Treasurer is trustee and administrator N.J.S.A. 43:21-28. All private plans are submitted for approval by the Division of Labor and Industry. N.J.S.A. 43:21-32 et seq.; N.J. Adm'v Code 12:18-2.5(c). Private plans may consist of insurance agreements between an employer and an insurer or a group of employees through a trust arrangement and an insurer. Coverage under such a private plan precludes coverage under the State Plan, and vice versa. N.J. Adm'v Code 12:18-2.2 and 12.18-3.1. The reason therefor is that minimum plan requirements are established for all private plans assuring coverage like that under the State Plan. N.J. Adm'v Code 12:18-2.10a.
The state disability benefits funds are in the custody of the State Treasurer. N.J.S.A. 43:21-46. He administers and disperses the funds from salary deductions of employees made by employers at regular intervals. Temporary disability benefits were enacted to protect employees against the risk of injuries and resulting unemployment due to "non-occupational sickness or accident." The collateral sources in N.J.S.A. 39:6A-6 complement one another. Temporary disability benefits complement the Workman's Compensation Law, which applies only to injuries caused to an employee "by accident arising out of and in the course of employment." N.J.S.A. 34:15-1. See Fulda, "Insurance," 8 Rutg. L. Rev. 257, 264 (Winter 1953). Medicare rounds out this complement by providing *143 for persons outside the employment sphere  the aged and disabled. Health insurance for the aged and disabled is provided. 42 U.S.C.A. § 1395 et seq.
This Court reemphasizes that temporary disability benefits may come from a private plan as well as the State Plan for which the State Treasurer is trustee and administrator. Adm'v Code 12:18-2.5(c) and N.J.S.A. 43:21-32 et seq. Plaintiff presumes incorrectly that all temporary disability benefits are public monies. While it is true that private plans providing for temporary disability payments must provide the same minimum coverage as the State Plan, they are a distinct, separate and exclusive source of funding. Admin. Code 12:182.9; 12:18-2, 2(a). Adm. Code 12:18-2.8 provides:
(a) An employer desiring to establish a private plan for the payment of benefits to employees, shall file an application on a form and in a manner prescribed by the Director. In requesting the form, the employer shall inform the Division whether the benefits will be provided by a contract of insurance, or by an agreement between the employer and a union or association representing his employees or by the employer as a self-insurer.
(b) If two or more employers desire to have their private plans insured by a single policy of insurance, either by mutual agreement or by agreement set forth in subsection (a) of this Section, each shall file an application for approval on a form and in a manner prescribed by the Director, designating a nominee, designee, trustee or one of them as his duly authorized agent for the purposes of this Act.
Inferentially, plaintiff is of the view that because the private plans constitute state action, they also involve public funds. Plaintiff cites no authority for such view. This court concludes that there exists no contractual duty of the State beyond supervision of such private plans. Monies received by private plans are held by them alone, unlike the public trust under the State Plan. Even if the benefits plaintiff were to receive derived from the State Plan, and they do not (since the employer conceded plaintiff could have collected benefits from his directly), this court would feel *144 compelled to conclude that N.J.S.A. 39:6A-6 does not constitute a use for private benefit since there is a paramount, valid public purpose for deducting temporary disability benefits from medical expenses recoverable from private insurers.
Plaintiff contends that the deduction of temporary disability benefits provides Liberty with a private benefit. In Roe v. Kervick, 42 N.J. 191, 223 (1964), Justice Francis held that expenditures of public money are not unconstitutional even if an incidental private benefit accompanies pursuit of the public purpose. In Roe relief of unemployment constituted a public purpose and the means were constitutional. There was no donation of the State's credit or appropriation of public monies for private use. Three reasons supported that holding. First, the loans given the private agency were granted for an obvious public purpose. Second, the public purpose was the paramount factor because the private agency devoted its money to relief of unemployment. Third, there existed consideration to remove the transaction from Art. VIII prohibition. The three-prong test from Roe requiring a public purpose, nature of scheme likely to effectuate that purpose, and sufficient public safeguards, is met in the instant case.
Determining whether there is a public purpose is essentially a search for reasonableness. Roe, supra. Plaintiff contends the clear-sighted public purpose of N.J.S.A. 39:6A-6 deprives him of the windfall of the double coverage he would normally receive. The court has disposed of this contention previously. Plaintiff recovers the full amount of loss he was entitled to recover from Liberty through two sources. The contract of insurance represents the net amount, not the gross amount, he can recover, since Liberty can deduct (in fact must deduct) the collateral sources. See Allen, supra. This rationale comports with New Jersey public policy to prevent double recovery while insuring maximum access to sources of indemnification. Silas, supra and Selected Risks Ins. Co., supra 140 N.J. Super. at 558-9. Set-off of *145 temporary disability benefits from automobile medical expenses maintains the separate systems of reparations for working persons for different risks of loss, each of which complements the other as intended by the Legislature. Plaintiff suffered $100 a week damages which he could have recovered in full. He could recover the $85 a week his employer was required to give if he had requested. The good faith offer of the difference, $15 a week, by Liberty could also have been accepted. Plaintiff elected to do neither.
The deductions of temporary disability benefits were intended by the Legislature to aid administrative efficiency and to reduce the cost of increased coverage and reparations of no-fault Insurance. This court must conclude, therefore, that under the public purpose prong of the Roe test, supra, N.J.S.A. 39:6A-6 passes muster.
Under the Roe test and its progeny it seems clear that there are sufficient safeguards to ensure the use of the collateral sources in N.J.S.A. 39:6A-6 for the public purpose intended. Temporary disability benefits are guaranteed, with overview by state administrative review. Temporary disability benefits serve their own function while aiding the administration of the no-fault legislation as intended, i.e., to reduce the size of claims. The need for the no-fault legislation at the time of enactment was little questioned, although there was much uncertainty that personal injury protection coverage (PIP), as a mandatory first party system under no-fault, would actually absorb many claims otherwise flowing into the higher-cost tort benefits allowed by the mixed system. See Commission Report, supra at 89-91. Ten different bills on no-fault auto liability insurance died in committee during 1971 and 1972. The Roe case and its progeny requires this court to conclude that the indirect benefit of setting off or deducting temporary disability benefits should be characterized as incidental and subordinate. At this late date Roe's cement has hardened, disallowing invocation of a literal reading *146 of Art. VIII, § III, paragraph 3.[1] See Bulman v. McCrane, 64 N.J. 105 (1973).
Plaintiff contends further that New Jersey case law allows "stacking" of insurance policies where primary coverage is insufficient to cover the claimant's actual loss resulting from a collision. There is no doubt that the majority view is represented by the three cases cited by plaintiff. However, that majority view relates to a contribution situation distinguishable and uncontrolling in the present case. In Beck v. Ohio Cas. Ins. Co., 135 N.J. Super. 1 (App. Div. 1975), Motor Club of America, Inc. v. Phillips, 66 N.J. 277 (1974), and in McFarland v. Motor Club of America Ins. Co., 120 N.J. Super. 554 (Ch. Div. 1972), the insurers were seeking to circumvent coverage through limiting clauses they had written in the contracts of insurance. Such clauses are considered void as against public policy, N.J.S.A. 17:28-1.1. In the present case, defendant insurer has complied with the mandatory exclusions required by the Legislature. Defendant was willing to reimburse the insured for his loss, setting off the temporary disability benefits the insured would have received. Secondly, N.J.S.A. 39:6A-6 guarantees that the insured can recover fully up to his actual damages. This court should not speculate why plaintiff failed to collect his temporary disability payments. But it is well settled that a waiver constitutes the intentional relinquishment of a known right. East Orange v. Bd. of Water Commrs., 41 N.J. 6, 17 (1963). An admission on the record is strong evidence of such a waiver with regard to plaintiff's collectible disability payments. Plaintiff cannot be heard to argue that Liberty bears the burden of his action when it complied with the statutory mandate and plaintiff did not comply.
*147 This court concludes that N.J.S.A. 39:6A-6, enacted in conjunction with the no-fault Legislation, N.J.S.A. 39:6A-1 et seq., is constitutionally valid, procedurally and substantively, under due process and equal protections of the law under the United States and New Jersey Constitutions. This court, however, acknowledges reservations about the success of no-fault Legislation in this State without substituting its judgment for that of the State Legislature. There is no appropriation of public funds.
Defendant's motion for summary judgment is hereby granted pursuant to R. 4:46-2. Judson v. Peoples Bank & Trust Co. of Westfield, 17 N.J. 67 (1954).
NOTES
[1] Justice Proctor in Smith v. Brennan, 31 N.J. 353, 361 (1960), stated:

"Stare decisis is a principle of adherence for the sake of continuity and stability, to precedents once established. But it applies primarily to decisions * * * which invite reliance and on the basis of which men order their affairs.