THOMAS GANGEMI, PLAINTIFF-APPELLANT, v. BERNARD
J. BERRY, *ET AL.*, DEFENDANTS-RESPONDENTS.

Argued June 20, 1957—Decided June 24, 1957—Opinion Delivered
July 9, 1957.

(1)

4

*Mr. Maurice C. Brigadier* argued the cause for the appellant (*Mr. Frank H. Itkin* on the brief; *Messrs. Wolf & Baumann,* attorneys).

*Mr. Frederick J. Gassert* argued the cause for the respondents Edward J. Spinello, Alfred T. Davis, Helen Marshall and J. Beier Theurer, constituting the County Board of Elections, James A. Tumulty, Jr., City Clerk, and Edward J. Borrone, County Clerk (*Messrs. Samuel Miller* and *James H. Dowden,* on the brief).

*Mr. Francis X. Hayes* argued the cause for the respondent Bernard J. Berry.

The opinion of the court was delivered by

Heher, J. The question at issue here is the constitutional sufficiency of the provisions of *L.* 1953, *c.* 211, *N. J. S. A.* 19:57–1 *et seq.,* styled the "Absentee Voting Law (1953)," purporting to authorize civilian absentee voting at elections held in New Jersey.

May 14, 1957, there was an election in Jersey City to choose five members of the city commission, constituted the local governing body; 21 names appeared as candidates on the voting machines and also on the paper ballots prepared for the use of absentee voters pursuant to the cited statute. On the final count, candidate Berry received 57,561 votes and candidate Gangemi 57,405 votes, a difference of 156 votes, placing Berry fifth and Gangemi sixth according to the vote polled by the several candidates. But these totals included, not only the absentee military service ballots cast, but also the outcome of a canvass of 458 civilian absentee ballots polled by leave of the statute; of the latter Berry

received 328 and Gangemi 74. This result was confirmed by a statutory recount; and a certificate of election was issued to Berry, who thereupon qualified and assumed charge of the office. It is conceded that Berry's "plurality was produced by the civilian absentee votes"; and thus the decisive question is whether the statutory direction to that end is in contravention of the State's organic law.

By this proceeding in lieu of prerogative writ, the plaintiff Gangemi demands that the County Board of Elections be directed to "review their canvass" and "set aside all ballots of all civilian absentees whether cast in [his] favor" or "in favor" of the incumbent Berry, and to certify his own election accordingly. Judge Proctor sustained the statute as a valid exercise of legislative power; and there was summary judgment for defendants. The plaintiff appealed to the Appellate Division; and on his motion we granted certification of the appeal.

Section 3 of the statute, *N. J. S. A.* 19:57–3, includes within the class entitled to vote by absentee ballot a "civilian absentee voter who expects to be or may be absent outside the State or the United States on the day on which an election is held or who may be within the State on the day of any election but because of illness or physical disability will be unable to cast his ballot at the polling place in his election district on the day of the election, provided he is a registered voter, and is not otherwise disqualified by law from voting in such election." A "civilian absentee voter" is therein defined, section 2, *N. J. S. A.* 19:57–2, as "any qualified and registered voter of the State who expects to be absent from the State on the day of any election and any qualified and registered voter who will be within the State on the day of any election but because of illness or physical disability will be unable to cast his ballot at the polling place in his election district on the day of the election."

■ The contention is that this purposed exercise of the legislative function is in excess of the "grant of power" contained in *Article* II, *paragraph* 4 of the 1947 *State Constitution,* and therefore void. This, in despite of the

basic principle that, unlike the Federal Constitution, the State Constitution is not a grant but a limitation of powers. *State v. Murzda,* 116 *N. J. L.* 219 (*E. & A.* 1936); *Behnke v. New Jersey Highway Authority,* 13 *N. J.* 14 (1953).

The particular provision of the Constitution is in these terms:

"4. In time of war no elector in the military service of the State or in the armed forces of the United States shall be deprived of his vote by reason of absence from his election district. The Legislature may provide for absentee voting by members of the armed forces of the United States in time of peace. The Legislature may provide the manner in which and the time and place at which such absent electors may vote, and for the return and canvass of their votes in the election district in which they respectively reside."

It is said in argument that the polestar of constitutional construction is the "framers" intention "when they adopted this provision," and reference is made to *State v. Lyons,* 1 *Terry* 77, 5 *A.* 2d 495 (*Del. Ct. Gen. Sess.* 1939), where it was found to be "an inescapable fact that *the direct question of absentee voting came before the [Constitutional] Convention and was intentionally eliminated* in so far as citizens in actual military service were concerned," and the "inference is unmistakable that the Convention expressly refrained from providing for absentee voting, but left the Constitution as it theretofore had been"; also that in the "Constitutional debates there are many statements indicating the clear understanding that the casting of a ballot was to be effected by the personal presence of the voter at the polls." (Emphasis, counsel's)

The cited case, it is said, exemplifies reliance upon the "history" of the particular constitution to the "exclusion of out-of-state decisions which were based on their respective state constitutions." And recourse is had to the holding there that where the debates of the Constitutional Convention "clearly point out the purpose of a particular provision of the Constitution," the "aid of such debates is valuable and satisfactory," (citing *Cooley's Const. Law* 142; 11 *Am. Jur.* 706), "especially * * * when the Constitution

became effective, as in Delaware, upon its adoption by the Convention, and was not subject to subsequent ratification by vote of the people," which, of course, is not the case in New Jersey. Of this, more hereafter.

Acknowledging the "well-recognized distinction" between State and Federal Constitutions, as pointed out in *State v. Murzda, supra,* it is nevertheless insisted that here we are concerned with a constitutional grant rather than a limitation of power, and where *"granting* as distinguished from *limiting* provisions [are] involved, this rule, to which the Court below axiomatically adhered, [is] not properly applicable," citing *State v. Carrigan,* 82 *N. J. L.* 225 (*Sup. Ct.* 1912). And we are also cited to *Robb v. City of Tacoma,* 175 *Wash.* 580, 28 *P. 2d* 327, 91 *A. L. R.* 1010 (*Sup. Ct.* 1933), where a distinction was made between provisions of state constitutions in substance "affirmative and permissive" and such as are "negative and prohibitive." We are told that the basic issue here "fits within that distinction," and, so tested, our constitutional provision "grants power in positive language and does not limit by express negative terminology," and so "we cannot say that which was not limited still exists," but rather that "what was granted in the light of what was said by the framers and scriveners thereof excludes the idea that any other grant was intended."

And here the maxim *expressio unius est exclusio alterius* is invoked, citing *Imbrie v. Marsh,* 3 *N. J.* 578 (1950).

We seek for the sense and meaning of the particular constitutional provision, related to the context and the essential character of the instrument itself. The government of the United States is one of enumerated powers; and in its very nature the State Constitution is not a grant but a limitation of the exercise of the sovereign power inherent in the people, subject to the limitations imposed by the grant to the general government and, as well, those so fundamental in the social compact as to be necessarily implied. *State v. Murzda, supra.* By *Article* IV, *section* I, *paragraph* 1 of the 1947 *State Constitution,* the people vested full sovereign authority in the Legislature, save as otherwise therein pro-

vided. *Schmidt v. Board of Adjustment, Newark,* 9 *N. J.*
405 (1952). The theory of our political system is that the
ultimate sovereignty is in the people, "from whom springs
all legitimate authority"; and (1) the legislative authority
in the States consists of "the full and complete power as it
rests in, and may be exercised by, the sovereign power of
any country, subject only to such restrictions as they may
have seen fit to impose, and to the limitations which are
contained in the Constitution of the United States," and
the legislative department "is not made a special agency for
the exercise of specifically defined legislative powers, but is
intrusted with the general authority to make laws at discre-
tion"; and (2) the apportionment to this department "of
legislative power does not sanction the exercise of executive
or judicial functions, except in those cases, warranted by
parliamentary usage, where they are incidental, necessary, or
proper to the exercise of legislative authority, or where the
constitution itself, in specific cases, may expressly permit it."
*Cooley's Constitutional Limitations* (8th ed.), 81, 175 *et seq.;*
180, *note.*

"[The people], in framing the constitution, committed to the
legislature the whole lawmaking power of the state, which they did
not expressly or impliedly withhold. Plenary power in the legis-
lature for all purposes of civil government is the rule. A prohibition
to exercise a particular power is an exception. In inquiring, there-
fore, whether a given statute is constitutional, it is for those who
question its validity to show that it is forbidden." *People ex rel.
Wood v. Draper,* 15 *N. Y.* 532, 543 (*App. Ct.* 1857), Denio, Ch. J.
The American legislatures "have the same unlimited power in regard
to legislation which resides in the British parliament, except where
they are restrained by written constitutions. That must be con-
ceded, I think, to be a fundamental principle in the political or-
ganizations of the American states. We cannot well comprehend
how, upon principle, it should be otherwise. The people must of
course, possess all legislative power originally. They have com-
mitted this in the most general and unlimited manner to the several
state legislatures, saving only such restrictions as are imposed by
the constitution of the United States, or of the particular state in
question." *Thorpe v. Rutland and Burlington Railroad Co.,* 27
*Vt.* 140 (*Sup. Ct.* 1854), Redfield, Ch. J.

And the inhibition of a constitution "may be either express or
implied; that is, the Constitution may expressly prohibit any
specified act of the Legislature, or the Constitution by its inherent

terms may *of necessity* prohibit certain acts of a Legislature by reason of the *inherent conflict* that would arise between the terms of the Constitution and the power claimed in favor of the Legislature." *State ex rel. Richards v. Whisman*, 36 *S. D.* 260, 154 *N. W.* 707, *L. R. A.* 1917B, 1 (*Sup. Ct.* 1915). (Italics supplied)

The object of construction of a written constitution is to give effect to the intent of the people in adopting it. In the case of all written laws, it is the intent of the lawgiver that is to be enforced; and, in the absence of ambiguity calling for permissible extrinsic aids, this intent is to be found in the instrument itself. *Cooley's Constitutional Limitations* (*8th ed.*), 124 *et seq.* Reason is the soul of law; the reason of the law being changed, the law is also changed. 7 *Coke* 7. So it is with constitutions. We look for "the thought which it expresses." *Newell v. People*, 7 *N. Y.* 9, 97 (*App. Ct.* 1852), Johnson, J. The spirit is its animating force, not the letter which killeth.

In delineating the essential quality and reach of constitutional limitations, the courts are enjoined, as in the construction of statutes, to consider the whole of the instrument with a view of arriving at the true intention of each part, bearing in mind that the primary design of a constitution is to put the fundamentals of government beyond the control of "the varying moods of public opinion," *Cooley, Ibid.* 124, and so it is to be presumed that the words employed have been carefully measured and weighed to convey a certain and definite meaning, with as little as possible left to implication. A constitutional prohibition against the exercise of a particular power is in the nature of an exception, and it is the settled rule of judicial policy in this State that a legislative act will not be declared void unless its repugnancy to the constitution is clear beyond reasonable doubt. "The constitutional limitation upon the exercise of legislative power must be clear and imperative"; there is to be "no forced or unnatural construction"; the limitation upon the general legislative power is to be "established and defined by words that are found written in that instrument," and not by reference to "some spirit that is supposed to pervade it or to underlie it * * *." *State v. Murzda, supra; State*

*v. De Lorenzo,* 81 *N. J. L.* 613 (*E. & A.* 1911). The Legislature is invested with all powers not forbidden.

And great caution is necessary in the use of the legal axiom *expressio unius est exclusio alterius,* for it is not of universal application, but "depends upon the intention of the party as it can be discovered upon the face of the instrument or upon the transaction." *Saunders v. Evans,* 8 *H. L. Cas.* 721 (1861), Lord Campbell. See *Broom's Legal Maxims* (*9th ed.*), 420 *et seq.* The maxim that the express mention of one thing implies the exclusion of another is purely interpretive in aid of intention, and not a rule of law; and it is not to have an arbitrary application at variance with its true purpose. The rule "is not to be applied with the same rigor in construing a state constitution as a statute"; "* * * only those things expressed in such positive affirmative terms as plainly imply the negative of what is not mentioned will be considered as inhibiting the powers of the legislature." *State v. Martin,* 60 *Ark.* 343, 30 *S. W.* 421, 28 *L. R. A.* 153 (*Sup. Ct.* 1895). The implication must be clear and compelling, a necessary consequence, not a conjectural or purely theoretical concept.

The 1947 Constitution does not in terms affirmatively prohibit civilian absentee voting; and the purpose so to do is not revealed as a matter of negative inference. The preceding *paragraph* 3 of *Article* II of the Constitution insures the right of suffrage to every citizen of the given age and residence qualifications. In regard to absentee voting, *paragraph* 4 treats electors absent in military service as in the one category, but differently as to imperative right depending upon whether the military service is rendered in time of war or in time of peace. In the former case, there is an absolute right to vote, constitutionally secured against legislative impairment, as was so under the 1844 Constitution; in the latter, the Legislature "may provide" for such absentee voting, a provision not expressly incorporated in the 1844 Constitution, perhaps deemed advisable in view of the general residence suffrage requirements of *paragraph* 3.

Be that as it may, there is no good reason to

suppose that by this express inclusion of a provision for military absentee voting in time of peace, a preexisting electoral exercise by constitutional sanction, and thus to provide suffrage for the military electors as an entire group, both in war and in peace, it was designed to exclude all civilian absentee voting by legislative authority. The one does not *per se* imply the other. So to hold would do violence to reason and logic. Such a curtailment of basic legislative power, granted by *Article* IV, *paragraph* 1 of the Constitution, cannot be made to rest upon vague and uncertain implication.

The mode and manner of the exercise of the right of suffrage is left to the sound discretion of the Legislature, but the constitutional qualifications of electors cannot be enlarged by the lawmaking authority, *Ransom v. Black,* 54 *N. J. L.* 446 (*Sup. Ct.* 1892), affirmed 65 *N. J. L.* 688 (*E. & A.* 1900); *Allison v. Blake,* 57 *N. J. L.* 6 (*Sup. Ct.* 1894); *In re Ray,* 26 *N. J. Misc.* 56 (*Cir. Ct.* 1947); *In re Freeholders of Hudson County,* 105 *N. J. L.* 57 (*Sup. Ct.* 1928); *Imbrie v. Marsh, supra; Cooley, Ibid.,* 1368; and such is the *ratio decidendi* of *State v. Carrigan, supra,* invoked by appellant, and thus a case inapposite here. See also *State v. Wrightson,* 56 *N. J. L.* 126, 201 (*Sup. Ct.* 1893), holding that where the Constitution prescribes the manner in which an officer shall be appointed or elected, the prescription is exclusive, and the Legislature may not provide any other mode of obtaining or holding the office.

The interpretation against enlargement of the electors' qualifications serves evident constitutional policy; but the constitutional provision for military service voting, an absolute right in time of war and by legislative leave in time of peace, is not in itself a bar to civilian absentee voting by legislative allowance in furtherance of the exercise of the basic right of suffrage, a civil and political franchise—of the very essence of our democratic process—that is to be liberally and not strictly construed to promote and not to defeat or impede the essential design of the organic law. Such is the spirit and the indubitable reason of the particular

constitutional provisions, taken and compared together in the context of the instrument as a whole. The Constitution embodies the will of the people, as the final law; and implication is but another term for a meaning made manifest in the writing itself. That which is not there by clear intendment is inadmissible.

The principle is exemplified in *Lemons v. Noller,* 144 *Kan.* 813 (*Sup. Ct.* 1936); *Sumner County v. Wellington,* 66 *Kan.* 590, 72 *P.* 216, 60 *L. R. A.* 850 (*Sup. Ct.* 1903); *Bullington v. Grabow,* 88 *Colo.* 561, 298 *P.* 1059 (*Sup. Ct.* 1931); *Moore v. Pullem,* 150 *Va.* 174, 142 *S. E.* 415 (*Sup. Ct. App.* 1928); *Jenkins v. State Board of Elections,* 180 *N. C.* 169, 104 *S. E.* 346, 14 *A. L. R.* 1247 (*Sup. Ct.* 1920); *Goodell v. Judith Basin County,* 70 *Mont.* 222, 224 *P.* 1110 (*Sup. Ct.* 1924); *Morrison v. Springer,* 15 *Iowa* 304 (*Sup. Ct.* 1863); *Lehman v. McBride,* 15 *Ohio St.* 573 (*Sup. Ct.* 1863). And see *"Review of Absentee Voters Legislation in Pennsylvania,"* 73 *U. of Pa. L. Rev.* (*January* 1925) 176–181.

Yet it is urged that the "drafters" of *Article* II, *paragraph* 4 of the 1947 *Constitution* "intended to grant the Legislature the power to deal only with absentee voting for members of the armed forces," and the "grant of power to the Legislature to deal with absentee civilian voting was intentionally and expressly rejected by the framers" of the Constitution; and in support of this thesis recourse is had to constitutional and statutory history and the proceedings attending the 1944 constitutional-revision submission to the people by the Legislature and the 1947 Constitutional Convention held at New Brunswick.

The State Constitution of 1844, as amended in 1875, *Article* II, *paragraph* 1, provided that "* * * in time of war no elector in the actual military service of the state, or of the United States, in the army or navy thereof, shall be deprived of his vote by reason of his absence from such election district; and the legislature shall have power to provide the manner in which and the time and place at which such absent electors may vote * * *."

This provision was implemented by *L.* 1876, *c.* 124; and the revision of the election laws effected in 1920, *c.* 349, *art.* 28, *sec.* 23, provided that an "absentee elector shall be deemed to be a qualified registered elector who by reason of inability through illness or absence from the county in which he resides is unable to cast his ballot on the day of the general election at the polling place in the election district in which he is registered  \*  \*  \*."

This statutory provision was repealed by *L.* 1926, *c.* 322, *art.* 28, *sec.* 72, as providing opportunity for fraud, according to the sponsor of the repealer. See Governor Driscoll's Sixth Annual Message to the Legislature, January 13, 1953.

The draft Constitution submitted to the Legislature in May 1942 by the "Commission on Revision of the New Jersey Constitution" contained a provision for military absentee voting in the mode and manner ordained by the Legislature, followed by this clause: "The Legislature may also provide for voting by other absent electors and for the like return and canvass of their votes." The quoted sentence was deleted by the Legislature from the later submission to the people.

The New Jersey League of Women Voters recommended the inclusion of the same provision in the 1947 Constitution, "in order to make possible a voting arrangement for the many citizens who find it necessary to be absent from their voting districts on election day"; inquiry revealed, it was said, that "Most states make some provision for such citizens."

The argument is that the sentence in question "was deleted even in the 1944 Revision in order to avoid giving the Legislature the authority to provide for absentee civilian balloting."

The report made July 31, 1947 by the Committee on Rights, Privileges, Amendments and Miscellaneous Provisions to the Constitutional Convention of 1947, which referred to a "new thought" giving the Legislature the "right" to provide for absentee voting by members of the armed forces in time of peace, is cited as inconsistent "with any intention that the Legislature had the right to deal with absentee voting without express constitutional authorization." And the pro-

ceedings of the Committee, in relation to proposals for specific mention in the new Constitution of civilian absentee voting, are read as indicating that the absence of such "express authorization" to the Legislature "was obviously not an oversight," but rather "an intentional curtailment of their authority," and the "presence of a civilian voter on election day in his voting district was thus made a qualification, 'shut-ins' and civil service employees absent from this State notwithstanding."

But whatever individual members of the Committee may have had in mind anent the significance of the particular provision as finally submitted, there was a sharp division of opinion on policy; and when the proposal reached the floor of the Convention, August 5, 1947, the debate as to policy and the legal effect of the submission was resumed: there were varying comments on both, and the result was the offer of an amendment by Delegate Lightner to include express provision for civilian absentee voting. Delegates Cavicchia and McGrath, lawyers of acknowledged learning and experience, known as such to the delegates, declared their opposition to the proposed amendment on the ground that the Legislature was already possessed of the power and the draft Constitution submitted would not terminate it, and prior experience with absentee voting had not been satisfactory. Said Delegate Cavicchia:

"On the amendment as amended, this admittedly is offered as a means of providing a vote for civilians who are absent on election day. I think in that respect we are loading up the Constitution, because I say to you that the Legislature has that right in any event."

Delegate McGrath:

"In the first place, it's nothing but pure legislation that loads up the Constitution with something that's not necessary. It fixes something in here which should not be fixed. And the language itself is very dangerous because it says, first of all, that the man shall be unavoidably absent. Now who is going to decide that to begin with?"

After offering other objections, Judge McGrath concluded:

"It seems to me that in the first place, we're dealing here with trivia. It's not a thing that should be in the Constitution at all; it's a matter for the Legislature to decide. * * * It's going to create a lot of confusion and it's a type thing that we ought to vote down, in my opinion, because it has no place whatever in our Constitution."

Thereupon, there being no expression *contra,* the roll was called and the offered amendment was rejected, 18 in the affirmative, 55 in the negative. 1 *Proceedings of the N. J. Constitutional Convention of* 1947, *pp.* 679–80.

It was all but conceded on the oral argument that under the 1844 Constitution, civilian absentee voting was a legislative process, an indisputable hypothesis, *Ransom v. Black, supra; In re Freeholders of Hudson County, supra;* and it goes without saying that in the given circumstances the claimed inference of an "intentional curtailment" of the pre-existing legislative power in this regard is utterly vain.

Moreover, the Constitution derives its force, not from the Convention which framed it, but from the people who ratified it; and the intent to be arrived at is that of the people. We inquire as to the meaning the symbols of expression would most naturally and plainly convey, the sense most obvious to the common understanding. *Cooley, Ibid.,* 143. The Constitution was written "to be understood by the voters; its words and phrases were used in their normal and ordinary as distinguished from technical meaning"; and "where the intention is clear there is no room for construction and no excuse for interpolation or addition." *United States v. Sprague,* 282 *U. S.* 716, 51 *S. Ct.* 220, 75 *L. Ed.* 640 (1931). See also *State v. Wrightson,* 56 *N. J. L.* 126, 208 (*Sup. Ct.* 1893); *Bonsal v. Yellott,* 100 *Md.* 481, 60 *A.* 593, 69 *L. R. A.* 914 (*App. Ct.* 1905).

Affirmed.

*For affirmance*—Justices HEHER, OLIPHANT, WACHEN-FELD, BURLING, JACOBS and WEINTRAUB—6.

*For reversal*—None.