ANN BARONE, PLAINTIFF-APPELLANT, v. DEPARTMENT OF HUMAN SERVICES, DIVISION OF MEDICAL ASSISTANCE AND HEALTH SERVICES, BUREAU OF PHARMACEUTICAL ASSISTANCE TO THE AGED AND DISABLED, DEFENDANT-RESPONDENT.

LOTTIE ADKINS, PLAINTIFF-APPELLANT, v. DEPARTMENT OF HUMAN SERVICES, DIVISION OF MEDICAL ASSISTANCE AND HEALTH SERVICES, BUREAU OF PHARMACEUTICAL ASSISTANCE TO THE AGED AND DISABLED, DEFENDANT-RESPONDENT.

Argued November 18, 1986—Decided June 23, 1987.

356

*Edward Kopelson* argued the cause for appellants (*David Lazarus*, Director of Litigation, Community Health Law Project, attorney).

*Ivan J. Punchatz*, Deputy Attorney General, argued the cause for respondent (*W. Cary Edwards*, Attorney General of New Jersey, attorney; *Michael R. Clancy*, Deputy Attorney

General, of counsel; *Melissa E. Hager*, Deputy Attorney General, on the brief).

The opinion of the Court was delivered by

GARIBALDI, J.

The New Jersey Pharmaceutical Assistance to the Aged and Disabled Act (Pharmaceutical Assistance Act or PAAD), *N.J.S.A.* 30:4D–20 to –35, grants benefits to financially-eligible disabled residents under the age of sixty-five who receive Social Security Title II Disability Insurance (SSDI) payments, but denies benefits to those disabled persons under the age of sixty-five who do not receive SSDI benefits. The issue in this appeal is whether this distinction—between disabled persons who receive SSDI benefits and those who do not—violates the equal protection clauses of the United States and New Jersey Constitutions. The Appellate Division upheld the constitutionality of the Act. 210 *N.J.Super.* 276 (1986). We granted certification, 104 *N.J.* 461 (1986), and now affirm.

I

The Pharmaceutical Assistance Act was originally enacted in 1975 to supplement the New Jersey Medical Assistance and Health Services Act, *N.J.S.A.* 30:4D–1 to –19, also known as Medicaid. Medicaid was intended to use federal appropriations to the states to provide medical assistance for the elderly, the disabled, and dependent children in need. Individuals eligible for assistance under Medicaid have their pharmaceutical costs paid through that program.

The Pharmaceutical Assistance Act was "designed to ease the burden of spiraling drug costs for senior citizens [and disabled residents] of modest incomes." *N.J.S.A.* 30:4D–25. As originally enacted in 1975, PAAD covered only those citizens over the age of sixty-five who were ineligible for Medicaid benefits because their incomes exceeded Medicaid requirements, but were nonetheless unable to afford prescription

drugs. Specifically, the program was open to any resident over the age of sixty-five whose annual income was less than $9,000. *L.* 1975, *c.* 194, § 2. Later in 1975, benefits were extended to any married resident whose income, combined with that of his or her spouse, was less than $12,000 annually. *L.* 1975, *c.* 312, § 1. Initially, the program reimbursed eighty percent of the cost of prescription medicine once the cost exceeded a sliding percentage of the recipient's income. *L.* 1975, *c.* 194, § 3. To simplify administration of the program, this sliding percentage was replaced by a requirement that beneficiaries pay one dollar of the cost of each prescription. *L.* 1977, *c.* 268, § 1. The program was not eligible for federal funding. Therefore, the State paid for it from the State's general revenues.

Participation in the Pharmaceutical Assistance Program increased rapidly. By 1978, there were approximately 270,000 senior citizens enrolled in the program. *N.J.S.A.* 30:4D–25. In 1978, the Legislature raised the co-payment requirement to two dollars, *L.* 1978, *c.* 171, § 2, explaining that "the overwhelming success of this program ... has resulted in costs far greater than those anticipated." *N.J.S.A.* 30:4D–25. The Legislature said:

> [A]lthough the Legislature is desirous of continuing the program as it currently exists, it recognizes that fiscal constraints and a heightened public awareness of the taxpayer's burden in this State makes it necessary to increase the share now paid by eligible senior citizens and reduce anticipated increases in the State contributions to the program in the future....
>
> A long-term legislative solution is now necessary which establishes this excellent and salutary program on a-sound fiscal basis at a level within the means of the Treasury, thereby enabling it to continue without further substantial modification.
>
> [*Id.*]

In 1981, the Pharmaceutical Assistance Act became a beneficiary of the Casino Revenue Fund. *N.J. Const.* 1947 Art. IV, § VII, para. 2D. This added revenue enabled the Legislature to raise the income ceiling for eligibility and to extend benefits for the first time to certain disabled citizens. *N.J.S.A.* 30:4D–21 was amended to provide:

Any single resident of this State who is either *disabled pursuant to the Federal Social Security Act (42 U.S.C. section 416(i))* or 65 years of age and over whose annual income is less than $12,000.00, or any married resident whose annual income combined with that of his spouse is less than $15,000, shall be eligible for "Pharmaceutical Assistance to the Aged and Disabled" if he is not otherwise qualified for assistance under the act to which this act is a supplement.

[*L.* 1981, *c.* 499, § 1 (emphasis added).]

A person is disabled under 42 *U.S.C.A.* § 416(i) if he or she (1) is unable to engage in "any substantial gainful activity" because of a physical or mental impairment that will result in death or can be expected to last at least twelve months; or (2) has "central visual acuity of 20/200 or less in the better eye with use of a correcting lense."

The Department of Human Services (Department) is charged with administering the Act. The Commissioner of Human Services (Commissioner) is authorized to, "by regulation[,] establish a system of payments or reimbursement and a system of determining eligibility." *N.J.S.A.* 30:4D–24. To implement *N.J.S.A.* 30:4D–21, as amended in 1981, the Commissioner promulgated *N.J.A.C.* 10:69A–6.2, which provided:

(a) Any single permanent resident of New Jersey who is 65 years of age and over *or who is under 65 and over 18 years of age and is receiving Social Security Title II disability benefits* must have an annual income of less than $12,000 to be eligible for PAAD.

(b) Any married permanent resident of New Jersey who is 65 years of age and over *or who is under 65 and over 18 years of age and receiving Social Security Title II disability benefits* must have a combined (applicant and spouse) annual income of less than $15,000 to be eligible for PAAD.

\*       \*       \*       \*       \*       \*       \*       \*

[ (Emphasis added).]

In 1982, several bills were introduced in the Legislature that would have expanded the Pharmaceutical Assistance Program to include persons receiving disability benefits from some program other than Social Security. *See* A–1268 (extending benefits to citizens receiving disability benefits from any federal source); A–1503 (extending benefits to those disabled under any federal or New Jersey law providing permanent disability benefits); S–1589 (extending benefits to persons receiving dis-

ability payments from the Federal Railroad Retirement program, the Federal Civil Service retirement program, and those rated as "totally disabled" by the Veteran's Administration). Each of these bills would have resulted in a significant increase in program expenses [1] and was defeated.

In 1985 the Legislature amended *N.J.S.A.* 30:4D–21 to raise the income eligibility limits and to explicitly provide that a disabled person must actually be receiving SSDI benefits in order to qualify for the Pharmaceutical Assistance Program:

Any resident of this State who is either a recipient of Disability Insurance benefits under Title II of the federal Social Security Act (42 U.S.C. § 401 et seq.) or 65 years of age and over and whose annual income is less than $13,250.00 if single or, if married, whose annual income combined with that of his spouse is less than $16,250.00, shall be eligible for "Pharmaceutical Assistance to the Aged and Disabled" if he is not otherwise qualified for assistance under P.L. 1968, c. 413 (C. 30:4D–1 et seq.).

[*L.* 1985, *c.* 291, § 1.]

The committee statement accompanying the 1985 amendment explained: "The definition of an eligible disabled resident is *clarified* to mean a recipient of Social Security Disability Insurance benefits." (Emphasis added.) The *Fiscal Note* accompanying the amendment expressed the Legislature's continuing concern about the funding of the program:

Senate Bill No. 3000, the FY 1985–86 appropriations bill, provides $19.5 million in additional funding for an expansion of the PAAD/Lifeline programs, including added administrative expenses. The source of the increased funding is the Casino Revenue Fund. Information compiled by the Department of Human Services and the Office of Legislative Services indicates that the budgeted increases should be sufficient, or very close to sufficient, to support the

---

[1] A–1268 would have raised administrative costs by $139,986 in FY 1983, $149,556 in FY 1984, and $159,918 in FY 1985, and raised drug costs by $1,450,548 in FY 1983, $1,594,890 in FY 1984, and $1,755,270 in FY 1985. *Fiscal Note to A–1268.* A–1503 would have increased administrative costs by $222,705 in FY 1983, $237,930 in FY 1984, and $254,415 in FY 1985, and increased drug costs by $2,803,815 in FY 1983, $3,084,480 in FY 1984, $3,393,495 in FY 1985. *Fiscal Note to A–1503.* S–1589 would have increased administrative costs by $131,274 in FY 1983, $140,118 in FY 1984, and $149,490 in FY 1985, and drug expenditures by $1,743,984 in FY 1983, $1,965,744 in FY 1984, and $2,211,264 in FY 1985. *Fiscal Note to S–1589.*

expansion of benefits resulting from higher income eligibility levels. The committee recommends that expenditures be monitored throughout the year to ascertain the need for supplemental funding at some later date.

The success of the Pharmaceutical Assistance Program in helping the needy obtain prescription drugs has created increasing fiscal strain on the program even though enrollment has actually decreased in recent years, from 289,755 in FY 1982 to 261,427 in FY 1985. *1985 PAAD Report* at 11. The Department attributes this decrease to "terminations resulting primarily from increased or excess income, combined with natural attrition." *1984 PAAD Report* at 1. Meanwhile, the costs of running the program have continued to escalate. Payments rose from $31,422,495 in FY 1979, to $55,739,906 in FY 1983, and $72,339,314 in FY 1985. *1985 PAAD Report, supra,* at 11. The cost of the average claim, which was only $6.65 in FY 1980, was $14.29 in FY 1985. *Id.* at 12. Most of this increase is attributable to the rising cost of drugs. *Id.* at 13.

The Department's records indicate that the average disabled recipient has greater needs than the average aged recipient. In FY 1985 the average disabled beneficiary generated more claims (26.1) and collected more benefits ($417.38) than the average aged beneficiary (20.3 prescriptions amounting to $286.96). *Id.* at 7.

II

In January 1985, appellants, Ms. Lottie Adkins and Mrs. Anne Barone, filed individual eligibility applications for the Pharmaceutical Assistance Program with the Department of Human Services, Division of Medical Assistance and Health Services.

Ms. Adkins was single and fifty-nine years old at the time of her application. She worked as a licensed practical nurse for about thirty years at the Essex County Hospital at Overbrook, an employer who did not contribute to the social security program. Ms. Adkins contributed to the Essex County Employees Retirement System, which does not provide coverage for

prescription drugs. She retired with a permanent total disability in 1979 and began receiving disability benefits from the county. In 1984 her annual pension amounted to $7,819.31.

Dr. Sidney Friedman, an internist who conducted examinations for the State Division of Disability Determinations, examined Ms. Adkins and concluded that she suffered from severe rheumatic and orthopedic problems as well as heart disease, bronchitis, gastritis, and psychiatric and ophthalmic conditions. He certified that Ms. Adkins was totally and permanently disabled, "unable to perform her prior gainful occupation...." Ms. Adkins nevertheless is ineligible for SSDI benefits. An applicant must be unable "to engage in any substantial gainful activity" in order to qualify for SSDI. 42 *U.S.C.A.* 416(i).

Mrs. Barone was married and sixty-one years old at the time of her application. Her husband received $761 per month in social security benefits, but she was not entitled to social security benefits because she had not worked outside the home after the age of sixteen. An eye examination performed by Dr. Philip Eichen in July 1984 showed that Mrs. Barone had 20/800 vision in each eye and that her vision even with corrective lenses could be improved to only 20/200. The State Commission for the Blind and Visually Impaired, using the same test for blindness that applies under SSDI, certified that Mrs. Barone was a "registered blind person." In addition, Mrs. Barone certified that she suffered from uncontrolled diabetes mellitus, cardiovascular disease, and deafness.

On January 25, 1985, the Division of Medical Assistance and Health Services denied the application of Ms. Adkins and Mrs. Barone on the ground that they were not over the age of sixty-five or receiving SSDI benefits. Ms. Adkins and Mrs. Barone each filed appeals in the Appellate Division, which were consolidated. They argued that the denial of benefits to them was unlawful because *N.J.A.C.* 10:69A–6.2(a), (b) exceeded the statutory authority of *N.J.S.A.* 30:4D–21 as it read at the time their applications had been filed. They also argued that *N.J.*

*S.A.* 30:4D–21, as it currently reads, is unconstitutional under the equal protection clauses of the federal and state constitutions because it irrationally discriminates between those financially eligible disabled persons who receive SSDI benefits and those who do not.

The Appellate Division affirmed the judgment of the Department. Relying on the Legislature's continuing concern about the financial condition of PAAD and its delegation of broad powers to the Department to promulgate rules and regulations, and according deference to the Department's expertise, the court concluded that *N.J.A.C.* 10:69A–6.2(a), (b) properly interpreted *N.J.S.A.* 30:4D–21 as it read prior to the 1985 amendment.[2] The court also concluded that the statute does not offend principles of equal protection because it rationally furthers a legitimate state purpose. Requiring receipt of SSDI benefits to be eligible for PAAD benefits eliminates the State's need to conduct individual disability determinations and thereby rationally furthers the legitimate interest of minimizing administrative costs and maximizing the funds available to pay for prescription drugs. We affirm the judgment of the Appellate Division and hold that *N.J.S.A.* 30:4D–21 does not violate the equal protection clauses of the United States or New Jersey Constitutions.

## III

### A.

Equal Protection claims under the fourteenth amendment are analyzed under a three tier approach. A statute that regulates a "fundamental right" or a "suspect class" is subject

---

2Plaintiffs did not raise this issue in their petition for certification. We agree, however, with the Appellate Division that the Department had explicit authority to promulgate *N.J.A.C.* 10:69A–6.2(a), (b), and that the regulation was consistent with the governing statute and in conformity with the Legislature's intent.

to "strict scrutiny." To withstand strict scrutiny, the statute must further a compelling state interest and there must be no less restrictive means of accomplishing that objective. *Graham v. Richardson*, 403 *U.S.* 365, 91 *S.Ct.* 1848, 29 *L.Ed.*2d 534 (1971). If a statute regulates a "semi-suspect" class or substantially affects a fundamental right in an indirect manner, it will be examined under an "intermediate scrutiny." To withstand intermediate scrutiny the classification must serve an important governmental objective and must be substantially related to the achievement of those objectives. *Craig v. Boren*, 429 *U.S.* 190, 97 *S.Ct.* 451, 50 *L.Ed.*2d 397 (1976). If neither strict nor intermediate scrutiny applies, the statute will be subjected to a "rational basis" test. To withstand this level of review, the statute must be rationally related to the achievement of a legitimate state interest. *Dandridge v. Williams*, 397 *U.S.* 471, 90 *S.Ct.* 1153, 25 *L.Ed.*2d 491 (1970).

■■■ The Pharmaceutical Assistance Act is not subject to strict scrutiny because it does not affect a suspect class or fundamental right. A suspect class is one "saddled with such disabilities, or subjected to such a history of purposeful unequal treatment or relegated to such a position of political powerlessness as to command extraordinary protection from the majoritarian political process." *San Antonio Indep. School Dist. v. Rodriguez*, 411 *U.S.* 1, 28, 93 *S.Ct.* 1278, 1294, 36 *L.Ed.*2d 16, 40 (1973). Neither poverty nor disability is a suspect classification. *See Schweiker v. Hogan*, 457 *U.S.* 569, 102 *S.Ct.* 2597, 73 *L.Ed.*2d 227 (1982). Fundamental rights are those which are "explicitly or implicitly guaranteed by the Constitution." *San Antonio Indep. School Dist. v. Rodriguez, supra*, 411 *U.S.* at 33, 93 *S.Ct.* at 1297, 36 *L.Ed.*2d at 43. Public assistance is not such a right. *See Dandridge v. Williams, supra*, 397 *U.S.* 471, 90 *S.Ct.* 1153, *L.Ed.*2d 491.

The Supreme Court applies intermediate scrutiny only when "concerns sufficiently absolute and enduring can be clearly ascertained from the Constitution" and the Court's decisions.

*Plyler v. Doe,* 457 *U.S.* 202, 218 n. 16, 102 *S.Ct.* 2382, 2395 n. 16, 72 *L.Ed.*2d 786, 800 n. 16 (1982). Classifications have been subjected to intermediate scrutiny when they have been based upon "semi suspect" classes, *see, e.g., Craig v. Boren, supra,* 429 *U.S.* 190, 97 *S.Ct.* 451, 50 *L.Ed.*2d 397 (classification based on gender), or when they have substantially affected a fundamental right in an indirect manner, *see, e.g., Bullock v. Carter,* 405 *U.S.* 134, 92 *S.Ct.* 849, 31 *L.Ed.*2d 92 (1972) (statute requiring filing fees for primary elections). Because plaintiffs are not members of a class that has been traditionally subject to discrimination, and because there is no fundamental right to public assistance, we believe that intermediate scrutiny is not appropriate in this case.

The Supreme Court has consistently analyzed social welfare statutes under a rational basis standard. Thus, social welfare statutes will be upheld under the fourteenth amendment if they are rationally related to a legitimate public end. *See Lyng v. Castillo,* 477 *U.S.* ——, 106 *S.Ct.* 2727, 91 *L.Ed.*2d 527 (1986) (statute defining eligibility for Food Stamps); *Schweiker v. Hogan, supra,* 457 *U.S.* 569, 102 *S.Ct.* 2597, 73 *L.Ed.*2d 227 (statute defining eligibility for Medicaid); *Califano v. Jobst,* 434 *U.S.* 47, 98 *S.Ct.* 95, 54 *L.Ed.*2d 228 (1977) (statute regulating the termination of Social Security benefits to surviving children); *Weinburger v. Salfi,* 422 *U.S.* 749, 95 *S.Ct.* 2457, 45 *L.Ed.*2d 522 (1975) (statute defining eligibility of surviving spouses and children for Social Security benefits); *Dandridge v. Williams, supra,* 397 *U.S.* 471, 90 *S.Ct.* 1153, 25 *L.Ed.*2d 491 (statute setting maximum benefit a family could receive under the Federal Aid to Families With Dependent Children program).[3]

---

[3] When welfare rights have been given priority, they have been linked to well-established constitutional rights. *See, e.g., Goldberg v. Kelly,* 397 *U.S.* 254, 90 *S.Ct.* 1011, 25 *L.Ed.*2d 287 (1970) (Court upheld due process challenge to regulation denying pre-termination hearings to welfare recipients, likening welfare rights to property rights); *Shapiro v. Thompson,* 394 *U.S.* 618, 89 *S.Ct.*

A statute satisfies the rational basis test even if the classification it makes is imperfect:

If· the classification has some "reasonable basis," it does not offend the Constitution simply because the classification "is not made with mathematical nicety or because in practice it results in some inequality." *Lindsley v. National Carbonic Gas Co.*, 220 *U.S.* 61, 78, 55 *L.Ed.* 369, 377, 31 *S.Ct.* 337. "The problems of government are practical ones and may justify, if they do not require, rough accommodations—illogical, it may be, and unscientific." *Metropolis Theatre Co. v. City of Chicago*, 228 *U.S.* 61, 69–70, 57 *L.Ed.* 730, 734, 33 *S.Ct.* 441. "A statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it." *McGowan v. Maryland*, 366 *U.S.* 420, 426, 6 *L.Ed.*2d 393, 399, 81 *S.Ct.* 1101. [*Dandridge v. Williams, supra*, 397 *U.S.* at 485, 90 *S.Ct.* at 1161, 25 *L.Ed.*2d at 501–502.]

Here the plaintiffs are not members of a suspect or semi-suspect class and there is no federal fundamental right at issue. Accordingly, the classification based upon receipt of SSDI benefits will be sustained under the equal protection clause of the fourteenth amendment if it is rationally related to a legitimate governmental purpose.

### B.

Although the phrase "equal protection" does not appear in the New Jersey Constitution, it has long been recognized that Article I, paragraph 1, of the State Constitution,[4] "like the fourteenth amendment, seeks to protect against injustice and against the unequal treatment of those who should be treated alike." *Greenberg v. Kimmelman*, 99 *N.J.* 552, 568 (1985).

Initially, we adopted a two tier rational basis/strict scrutiny test to evaluate equal protection claims under the State Constitution. In *Robinson v. Cahill*, 62 *N.J.* 473, 491–92 (1973),

---

1322, 22 *L.Ed.*2d 600 (1969) (one-year residency requirement for welfare benefits impermissibly burdened the fundamental right to travel).

[4]The New Jersey Constitution, Article I, paragraph 1 provides that "[a]ll persons arè by nature free and independent, and have certain natural and inalienable rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing, and protecting property, and of pursuing and obtaining safety and happiness."

however, we noted our dissatisfaction with this rigid analytical structure:

> Mechanical approaches to the delicate problem of judicial intervention under either the equal protection or the due process clauses may only divert a court from the meritorious issue or delay consideration of it. Ultimately, a court must weigh the nature of the restraint or the denial against the apparent public justification, and decide whether the State action is arbitrary. In that process, if the circumstances sensibly so require, the court may call upon the State to demonstrate the existence of a sufficient public need for the restraint or the denial.

In *Borough of Collingswood v. Ringgold*, 66 *N.J.* 350, 370 (1975), appeal dismissed, 426 *U.S.* 901, 96 *S. Ct.* 2220, 48 *L.Ed.*2d 826 (1976), we rejected the two tier mode of analysis in favor of a more flexible balancing test. The crucial issue in each case is "whether there is an appropriate governmental interest suitably furthered by the differential treatment" involved. *Id.* "In striking the balance, we have considered the nature of the affected right, the extent to which the governmental restriction intrudes upon it, and the public need for the restriction." *Greenberg v. Kimmelman, supra,* 99 *N.J.* at 567.

To a large extent, the considerations guiding our equal protection analysis under the New Jersey Constitution are implicit in the three tier approach applied by the Supreme Court under the Federal Constitution. *Id.* Both tests consider the nature of the individual rights affected by the governmental action being challenged, the importance of the governmental interests being furthered, and the degree to which the challenged restriction is necessary to achieve those interests. Therefore, the two tests will often yield the same result. At the same time, however, "the New Jersey Constitution is not a mirror image of the United States Constitution," *id.* at 568, and there may be circumstances in which the State Constitution provides greater protections. "Even under more traditional approaches, New Jersey has always required a real and substantial relationship between the classification and the governmental purpose which it purportedly serves." *Taxpayers Ass'n of Weymouth Township v. Weymouth Township,* 80 *N.J.* 6, 43 (1976), *cert.* denied

*sub nom. Feldman v. Weymouth Township,* 430 *U.S.* 977, 97 *S.Ct.* 1672, 52 *L.Ed.*2d 373 (1977).

Neither poverty nor disability is a suspect classification in New Jersey. *Right to Choose v. Byrne,* 91 *N.J.* 287, 305 (1982); *Levine v. Institutions & Agencies Dep't of N.J.,* 84 *N.J.* 234, 259 (1980). Nor does entitlement to PAAD benefits rise to the level of a fundamental right. Plaintiffs assert that partial reimbursement of the cost of prescription drugs is an entitlement to a health benefit that approximates a fundamental right, relying primarily on *Right to Choose v. Byrne, supra,* 91 *N.J.* at 310.[5] But in that case, we specifically stated that we were not "determining whether a constitutional right to health exists in New Jersey." 91 *N.J.* at 293. Instead, we narrowly defined a category of health interests to be accorded special constitutional protection—in that case medically necessary abortions. Partial reimbursement for prescription drugs is not akin to the funding of medically necessary abortions for poor women.

## IV

In determining whether the legislative classification is rationally related to a legitimate governmental purpose we are reminded that

the Legislature has wide discretion in determining the perimeters of a classification, *Harvey v. Essex Cty. Bd. of Freeholders,* 30 *N.J.* [381] at 390, distinctions may be made with substantially less than mathematical exactitude, *Lane Distributors, Inc. v. Tilton,* 7 *N.J.* 349, 358–359 (1951), and an adequate factual basis for the legislative judgment is presumed to exist, *Burton v. Sills,* 53 *N.J.* 86, 95 (1968), app. dism. 394 *U.S.* 812, 89 *S.Ct.* 1486, 22 *L.Ed.*2d 748 (1969). We must also be mindful of the strong presumption in favor of constitutionality,

---

[5]Plaintiffs also rely on the New Jersey Constitution, Article IV, section 7, paragraph 2 (the casino amendment), to support their argument that, as low-income disabled residents of this state, they have a state constitutional entitlement to PAAD benefits. We, however, construe this constitutional provision as authorizing use of casino funds to fund the program. It does not govern the rights of citizens to receive benefits or determine that casino funds be allocated in any specific fashion. *Young v. Byrne,* 144 *N.J.Super.* 10 (Law Div.1976).

*David v. Vesta Co.*, 45 *N.J.* 301, 315 (1965), and the traditional judicial reluctance to declare a statute void, a power to be delicately exercised unless the statute is clearly repugnant to the Constitution. *Brunetti v. New Milford*, 68 *N.J.* 576, 599 (1975); *Harvey v. Essex Cty. Bd. of Freeholders*, 30 *N.J.* at 388; *Gangemi v. Berry*, 25 *N.J.* 1, 10–11 (1957). [*Paul Kimball Hosp., Inc. v. Brick Township Hosp.*, 86 *N.J.* 429, 446–47 (1981).]

State funds available for public assistance programs are limited. It is the Legislature that has the duty to allocate the resources of the State. As long as the classification chosen by the Legislature rationally advances a legitimate governmental objective, it need not be the wisest, the fairest, or the one we would choose. It is not for the courts to determine if there is a better way to allocate resources under these programs.

█ With those concerns in mind, we hold that *N.J.S.A.* 30:4D–21, which defines eligibility for PAAD benefits, withstands scrutiny under both the state and federal equal protection clauses. The legislative history of the Pharmaceutical Assistance Act evidences the Legislature's concern about the continued fiscal integrity of the Pharmaceutical Assistance Program and a desire to maximize the amounts of funds used to provide benefits. *See supra*, at 358–362. The State argues that to open eligibility to others, including those considered 100% disabled for purposes other than SSDI benefits, would substantially increase the cost of the PAAD program, possibly jeopardizing it altogether. It cites as support the *Fiscal Note to A.1503*, dated September 10, 1982, that states that if eligibility were extended to persons not covered by Social Security, but classified as disabled under any federal or New Jersey law, an additional 10,500 beneficiaries would be added. The *Fiscal Note* goes on to say:

> The Social Security Bulletin notes *that upwards of 700,000 people in New Jersey consider themselves "disabled."* Thus, there may be the need for greater specificity as to who is disabled, otherwise the PAAD program's administrative costs would increase beyond the present 5% of the total cost. [ (Emphasis added).]

Since PAAD is funded through State dollars, each dollar spent in administration of the program takes a dollar from expenditures on pharmaceuticals.

The Act's definition of "disabled" rationally furthers the Legislature's goal because it eliminates the administrative costs that would be incurred if the state were to make independent disability determinations, thereby maximizing the benefits available to the applicants.

Plaintiffs argue that restricting PAAD benefits to SSDI recipients is irrational where a governmental agency has already certified the applicant disabled for purposes of another assistance program. We disagree because the fact that an applicant is "disabled" under one government program does not mean that he or she is "disabled" under the Pharmaceutical Assistance Act. The Social Security Administration requires evidence of the "inability to engage in substantial gainful activity." 42 *U.S.C.A.* 416(i)(1); 42 *U.S.C.A.* 1382c(a)(3)(A). County retirement systems demand proof that he or she is "physically or mentally incapacitated for the performance of duty" as a result of an injury, accident or sickness arising from the course of employment. *N.J.S.A.* 43:10–5.2. The Railroad Retirement System requires applicants to prove their "permanent physical or mental condition is such that they are unable to engage in any regular employment." 45 *U.S.C.A.* § 231a(a)(1)(v). A Federal Civil Service disability determination means that the individual is "unable, because of disease or injury, to render useful and efficient service in the employee's position and is not qualified for reassignment, under procedures prescribed by the Office, to a vacant position which is in the agency at the same grade or level and in which the employee would be able to render useful and efficient service." 5 *U.S. C.A.* § 8337(a). In each of these situations, the state would have to perform an independent evaluation to determine an applicant's eligibility for PAAD.

Even if two government programs define disability as an "inability to engage in substantial gainful activity," a disability determination by one agency is not necessarily a substitute for a determination under the other. "Substantial" and "gainful" are subjective terms whose meaning can vary depending upon

the purpose of the particular program in issue. One agency may have a more stringent definition of substantial and gainful. Agencies may use different tests in making their determinations. One agency may resolve doubt in favor of the state while the other resolves it in favor of the applicant.

By making eligibility for PAAD benefits contingent upon receipt of SSDI payments, the State saves not only the cost of making disability determinations, but also the cost of providing redress to those persons who were denied benefits or whose benefits were terminated. When the Social Security Administration denies an application for benefits, it must send the applicant a written statement setting forth the evidence that the Administration relied upon and the reason(s) that the application was denied. 42 *U.S.C.A.* § 405(b)(1). An applicant who receives an adverse decision has sixty days from receipt of the Administration's notice to request a hearing. Similar protections are given to recipients whose benefits are terminated. The Administration can terminate SSDI benefits if there is "substantial evidence" that the physical or mental impairment that was the basis for benefits is found to have never existed or ceased to exist. 42 *U.S.C.A.* § 423(f) (West Supp.1987). If benefits are terminated, the recipient is entitled to a hearing under 42 *U.S.C.A.* § 405. If the State were to make independent disability determinations for PAAD and provide analogous procedural protections, administrative costs would substantially increase. This would further undermine the Legislature's goal of maximizing the amount of PAAD funds available to provide benefits.

Plaintiffs also urge that the burden of making independent disability determinations would be minimal because the Department of Human Services already has a Medical Review Team that makes disability determinations. *See N.J.A.C.* 10:71-3.-11(e). We disagree. The purposes of the Medical Review Team is to make disability determinations for those who are economically eligible for Medicaid. If the Team were to receive the added responsibility to make disability determinations for thou-

sands of PAAD applicants, the Team would require increases in staff and funding. Administrative difficulties would be compounded by the fact that the Medical Review Team is funded through Medicaid. Although it is state run, Medicaid is largely funded by the federal government. The Pharmaceutical Assistance Program, on the other hand, is funded entirely by the state.

A state may consider fiscal and administrative constraints in defining eligibility for social welfare programs. As we noted in *State v. Senno*, 79 *N.J.* 216, 228 (1979):

> Lack of money or manpower places pragmatic limitations on many a worthy endeavor. Nor, as is here contended, are such considerations impermissible. For instance, limited resources available for welfare may be allocated by a State in a manner which favors some above others provided a rational basis for the allocation is perceived. *Dandridge v. Williams*, 397 *U.S.* 471, 483–87, 90 *S.Ct.* 1153, 1160–62, 25 *L.Ed.*2d 491, 501–03 (1970); *Jefferson v. Hackney*, 406 *U.S.* 535, 549–51, 92 *S.Ct.* 1724, 1732–34, 32 *L.Ed.*2d 285, 297–99 (1972). So, too, the exclusion of a class of addicts from a rehabilitation program may rest, in part at least, upon a State's determination to allocate finite resources in aid of those most likely to benefit from the program. *Marshall v. United States*, *supra*, 414 *U.S.* 417, 429, 94 *S.Ct.* 700, 707, 38 *L.Ed.*2d 618, 628 (1974). It must be remembered that under the rational basis test, classifications are not required to be mathematically perfect or incapable of improvement. *See Hudson Circle Servicenter v. Kearny*, 70 *N.J.* 289, 316–18 (1976). The State is able to recognize degrees of harm and strike at what it believes to most urgently require attention. *See State v. Smith*, 58 *N.J.* 202, 207 (1971).

## V

The present case is analogous to *Califano v. Jobst, supra*, 434 *U.S.* 47, 98 *S.Ct.* 95, 54 *L.Ed.*2d 228, in which the Supreme Court upheld a federal statute terminating a dependent child's Social Security benefits if he or she married a person receiving Social Security benefits. Jobst was disabled by cerebral palsy since his birth in 1932. He qualified for child's insurance benefits in 1957. In 1970, he married another cerebral palsy victim. His benefits were terminated because his spouse was not eligible for Social Security benefits. A 1958 amendment to the Social Security Act provided that a dependent child's bene-

fits terminated if he or she married a spouse ineligible for benefits, but would continue if the spouse received benefits.

The Court upheld this classification on the ground that it was rationally related to need.

> The 1958 amendment reflects a legislative judgment that a marriage between two persons receiving benefits will not normally provide either spouse with protection against the economic hardship that would be occasioned by the termination of benefits. The Secretary submits, and we agree, that it was reasonable for Congress to ameliorate the severity of the earlier rule by protecting both spouses from the dual hardship which it effected.
>
> [*Id.* at 55, 98 *S.Ct.* at 100, 54 *L.Ed.*2d at 236 (footnote omitted).]

Although the assumption that marriage to a person not receiving Social Security benefits signals the end of financial need may not be true in every instance, the Court stressed that the statute had to "be judged by reference to characteristics typical of the affected classes rather than by focusing on selected, atypical examples." *Id.* The Court upheld the statute because it eliminated the need for the government to make individual determinations of need:

> The exception, like the general rule itself, is simple to administer. It requires no individualized inquiry into degrees of hardship or need. It avoids any necessity for periodic review of the beneficiaries' continued entitlement. In the cases to which the exception does apply, it is a reliable indicator of probable hardship. Since the test is one that may be applied without introducing any new concepts into the administration of the trust fund, Congress could reasonably take one firm step toward the goal of eliminating the hardship caused by the general marriage rule without accomplishing its entire objective in the same piece of legislation. *Williamson v. Lee Optical Co.* 348 *U.S.* 483, 489, 99 *L.Ed.* 563, 75 *S.Ct.* 461 [465]. Even if it might have been wiser to take a larger step, the step Congress did take was in the right direction and had no adverse impact on persons like the Jobsts.
>
> [*Id.*, 434 *U.S.* at 56–58, 54 *L.Ed.*2d 236–37, 98 *S.Ct.* at 101 (footnote omitted).]

The classification at issue in the present case functions much like the classification at issue in *Jobst.* ° Just as Congress can rationally use marital status as an indication of need, the New Jersey Legislature can use a person's receipt of Social Security disability payments as an indication of his or her eligibility for PAAD benefits. Like the classification in *Jobst*, PAAD's definition of "disability" reduces administrative expenses and maximizes the amount of funds available to pay benefits. Neither

classification is unlawful simply because it is not a perfect test for need.

Plaintiffs rely heavily on *Ranschburg v. Toan*, 709 *F*.2d 1207 (1983), in which the Eighth Circuit ruled that Missouri's definition of "disabled" for purposes of the state's "Utilicare" program violated the equal protection clause. The purpose of the Utilicare program was to help financially needy elderly and disabled citizens pay their utility bills. The program defined the "disabled" as those receiving disability benefits under any one of six government assistance programs. Plaintiff had been certified disabled under Missouri's Medical Assistance Program, which was not one of the six enumerated programs. The court found that Missouri had no rational basis to deny plaintiff benefits under the Utilicare Program.

We find that *Ranschburg* is not applicable to the present case. First, there was no legislative history for the Utilicare program. As the Court of Appeals stated, "The Missouri legislature's reason for limiting the class of disabled persons who may receive Utilicare benefits is not apparent from the face of the statute and no legislative history is available." *Id.* at 1209. In sharp contrast, there is extensive reliable evidence that the New Jersey Legislature limited PAAD benefits to those disabled citizens receiving SSDI benefits in order to minimize administrative expenses and maximize the amount of funds available to pay benefits. Second, in *Ranschburg*, the state did not even argue that the classification was needed to minimize administrative expenses. Third, the parties in *Ranschburg* stipulated, and the court therefore assumed, that a disability determination under one of the statutorily enumerated programs was equivalent to a disability determination for purposes of the Utilicare program. Fourth, and perhaps most importantly, the number of individuals who were receiving Medical Assistance on the basis of permanent disability and were denied Utilicare benefits was fifty-six. The Court reasoned that there was no apparent reason for not extending the Utilicare benefits to these fifty-six individuals for whom the

State had already made a disability determination. However, the *Ranschburg* Court expressly noted:

> Of course, a different analysis would apply if the plaintiff class consisted of individuals who had not been determined to be disabled under some acceptable process, thereby requiring the Department of Social Services to make individualized determinations of disability. In that situation, the court would have to decide whether administrative convenience is a legitimate state interest. *See Medora v. Colautti*, 602 *F.*2d 1149, 1153 & N. 9 (3rd Cir.1979). But this issue need not be decided here.
>
> [709 *F.*2d at 1212 n. 10.]

Such is the situation presented in this case if plaintiffs prevail. Here, the potential class of new recipients is not *fifty-six* but *10,500.* Thus, the state would be faced with making individualized determinations of disability for over 10,-000 new recipients of PAAD benefits. We have no doubt that these determinations would substantially increase the administrative burdens and costs of the Program. Thus we find the administrative inconvenience coupled with the increased fiscal cost to the state rises to a real and substantial governmental interest.

## VI

Throughout the history of PAAD, the Legislature has expressed serious concerns about the fiscal consequences of the program. While there may be a better method of using the available funds allocated to the program, we conclude that the Legislature's method of making the actual receipt of SSDI benefits a prerequisite to the receipt of PAAD benefits is rational and furthers the legitimate governmental purpose of minimizing the program's costs while maximizing its benefits to recipients. We find the language of the Supreme Court in *Dandridge v. Williams, supra,* 397 *U.S.* at 487, 90 *S.Ct.* at 1162–1163, 25 *L.Ed.*2d at 503, is applicable to this case:

> We do not decide today that the [New Jersey] regulation is wise, that it best fulfills the relevant social and economic objectives that [New Jersey] might ideally espouse, or that a more just and humane system could not be devised. Conflicting claims of morality and intelligence are raised by opponents and proponents of almost every measure, certainly including the one before us.

> But the intractable economic, social, and even philosophical problems presented by public welfare assistance programs are not the business of this Court. The Constitution may impose certain procedural safeguards upon systems of welfare administration. *Goldberg v. Kelly,* 397 *U.S.* 254, 25 *L.Ed.*2d 287, 90 *S.Ct.* 1011. But the Constitution does not empower this Court to second-guess state officials charged with the difficult responsibility of allocating limited public welfare funds among the myriad of potential recipients. [citations omitted.]

The judgment of the Appellate Division is affirmed.

*For affirmance*—Chief Justice WILENTZ and Justices HANDLER, POLLOCK, O'HERN and GARIBALDI—5.

*For reversal*—Justices HANDLER and STEIN—2.

STEIN, J., dissenting.

The majority opinion's thesis for sustaining legislative and administrative restrictions on pharmaceutical assistance to disabled persons is uncomplicated and inviting. According to the majority, restricting such assistance only to those disabled persons receiving disability benefits under the Social Security Act is constitutional because it is rational, and it is rational because it "eliminates the State's need to conduct individual disability determinations and thereby * * * furthers the legitimate interest of minimizing administrative costs * * *." *Ante* at 364.

The problem with the majority's analysis is that it applies the rational basis test to the wrong group—those *included* in the PAAD program. Of course it is "rational" for government to limit a benefit program to a restricted group if to do so saves money and administrative effort. The question is whether, in the context of the purpose of the program, there is a rational basis for *excluding* those to whom the benefits have been denied. Tested by this inquiry and applying the rational basis test used by the majority, these restrictions on eligibility for pharmaceutical benefits cannot be sustained.

Thus, a preliminary question we must answer is who is *ineligible* for Social Security disability benefits—and why. The answer is found in the Social Security Act, 42 *U.S.C.* §§ 301–

1397 (1983 & Supp.1987). A variety of services are excluded from the definition of "employment" covered by the Act, including some agricultural jobs and domestic positions, and certain services performed for federal agencies if covered by a federal retirement system. 42 *U.S.C.* § 410. Services performed in the employ of a state or a political subdivision of a state are also excluded unless social security coverage is provided pursuant to an agreement between the State and the Secretary of Health and Human Services. 42 *U.S.C.* §§ 410, 418. *See generally* A. Abraham and D. Kopelman, *Federal Social Security*, at 7–22 (1979) (discussing covered employment under the Social Security Act).

Thus, petitioner Lottie Adkins, who worked for the County of Essex at Overbrook Hospital for approximately thirty years until her retirement in 1979, does not receive Social Security disability benefits, but not because she is insufficiently disabled. She suffers from arteriosclerotic heart disease and rheumatic disease with severe orthopedic limitations. A privately-retained physician certified that her disabling conditions satisfy the SSDI standards. However, she is denied PAAD benefits because the employer who hired her in 1949 was excluded from participation in the Social Security program. The precise constitutional issue before us is whether, given the legislative purpose of the PAAD program, there is a rational basis for excluding Ms. Adkins, or persons similarly situated, because the employment she undertook years ago was excluded from coverage under the Social Security Act.

Petitioner Barone, certified as blind by the State Commission for the Blind and Visually Impaired under the same test for blindness that applies for SSDI benefits, never worked outside the home after the age of sixteen. The record is unclear whether this was due to her visual impairment or the responsibilities of raising her children, or both. In any event, since Social Security disability benefits depend on a required period

of covered employment, Ms. Barone is plainly ineligible for SSDI. Assuming that she meets the SSDI test for disability, what rational basis—in the context of the legislative purpose of PAAD—can there be for denying her benefits?

The majority begs the question when it observes that the test for disability under the Social Security Act, "inability to engage in substantial gainful activity," 42 *U.S.C.* § 416(i)(1), is different from the test imposed under other disability benefits programs. *Ante* at 370–371. There is no question that the legislature could, if it desired, adopt as its standard for disability that imposed by the Social Security Act. But it has not adopted that standard—or any other standard of disability—to test eligibility for pharmaceutical assistance. Instead, it has restricted eligibility to those disabled persons who both meet the SSDI standard and who, during their working lives, had employment that was covered by the Social Security Act.

The State of New Jersey has the right to grant or deny pharmaceutical benefits to disabled persons. If it grants such benefits, presumably on the basis that disabled persons have a greater need for pharmaceutical assistance than the rest of the population, it can impose such reasonable standards of eligibility as are consistent with the legislative purpose, taking into account the resources available for funding such benefits. It can rationally exclude from coverage under such a program persons insufficiently disabled to meet the legislative or regulatory standard. But it cannot rationally exclude disabled persons simply on the basis that during their working years they were not employed for a sufficient period by employers eligible for coverage under the Social Security Act. Such an exclusion, in the context of the purpose of pharmaceutical assistance benefits, does not serve a rational governmental purpose and therefore violates federal and state constitutional standards. *Ranschburg v. Toan,* 709 *F.*2d 1207 (8th Cir.1983); *Greenberg v. Kimmelman,* 99 *N.J.* 552, 567 (1985).